Mitchell B. Seidman, Esq. (MS 0894)
**SEIDMAN & PINCUS, LLC**
777 Terrace Avenue, Suite 508
Hasbrouck Heights, New Jersey 07604
Phone: (201) 473-0047
Fax:    (201) 288-7009
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUSAN LATRONICA and MICHAEL LATRONICA,<br><br>                                    Plaintiffs,<br><br>vs.<br><br>ROYAL CARIBBEAN CRUISES, LTD., ROYAL CARIBBEAN INTERNATIONAL, JERDON PRODUCTS, LLC, ELEC-TECH INTERNATIONAL CO. LTD, ORIENTAL UNIVERSE, JOHN DOE DEFENDANT #4, JOHN DOE DEFENDANT #5, and JOHN DOE DEFENDANTS #6 THROUGH #15,<br><br>                                    Defendants. | CIVIL ACTION NO. 2:09-cv-06148<br><br><br>**CERTIFICATION OF MITCHELL B. SEIDMAN, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION TO SERVE NEW/AMENDED EXPERT <u>MEDICAL REPORT</u>** |

**MITCHELL B. SEIDMAN, ESQ.**, hereby certifies pursuant to 28 U.S.C. § 1746 as follows:

1.     I am an attorney duly admitted to practice law before the Courts of the State of New Jersey and the United States District Court for the District of New Jersey.  I am the Managing Member of Seidman & Pincus, LLC, attorneys for the Plaintiffs in this case. Accordingly, I am fully familiar with the matters as set forth below.

2.     I submit this Certification in support of Plaintiffs' motion for the entry of an Order granting Plaintiffs leave to serve new/amended expert medical reports (the "**Motion**"). The new/amended expert medical reports sought to be served are those of Dr. David Anschel

dated July 7, 2014 and February 6, 2015. (Dr. Anschel's February 6, 2015 report is a supplement to his July 7, 2014 report – leave is sought to serve both herein).

3.      On January 7, 2015 a conference took place in this case before Magistrate Judge James B. Clark, III.  As a result of that conference Magistrate Judge Clark entered a "Letter Order" that same day that Plaintiffs were "to file a motion to serve a new/amended expert medical report."  See Magistrate Judge Clark January 7, 2015 Letter Order [Dkt. #68].  This Motion is the motion called for by Magistrate Judge Clark's Letter Order

4.      By way of background, this is a products liability case arising out of Plaintiff Susan Latronica ("**Susan**") being electrocuted by a hairdryer while on a cruise with Royal Caribbean Cruises, Ltd. and Royal Caribbean International ("**Royal Caribbean**") on June 21, 2007.  The hairdryer supplied by Royal Caribbean in her cabin which she was using malfunctioned and/or was defective (the hair dryer sparked, stopped functioning, charred her hand/arm, and caused neurologic and other damage).  As such, this case is a tort/products liability case brought by Plaintiffs against the retailer, distributor, and manufacturer of the product for the injuries which Susan suffered.  Plaintiff Michael Latronica is the husband of Susan Latronica who has a *per quod* claim in this case.  After Susan was electrocuted by the hairdryer on June 21, 2007, Plaintiffs brought the instant suit against the retailer, distributor, and manufacturer of the hairdryer – the retailer being Royal Caribbean in that it was Royal Caribbean who made the hair dryer available to the public for use

## FACTUAL BACKGROUND

5.      In order to provide the Court with competent evidence of the underlying facts of this case, I annex hereto as **Exhibit A** Plaintiffs' Answers to Forms A and A(2) Uniform Interrogatories, dated April 22, 2009.  In response no. 2 to Uniform Interrogatories Form A, the

Plaintiffs set forth their chronological version of the accident or occurrence which is summarized as follows.

**December 2006** – Sometime during December of 2006 Plaintiffs determined to take a cruise vacation in the Caribbean. At that time they booked a trip on line directly with Royal Caribbean, not through any travel agency. The trip which they booked was a five day cruise to Bermuda which left on Father's Day, June 17, 2007, and was scheduled to return on June 22, 2007.

**June 17, 2007** – On June 17, 2007 the Plaintiffs left with Royal Caribbean on their five day cruise trip to Bermuda. The name of the ship which they cruised on was the "Explorer Of The Seas". Their cabin was cabin #1234 on deck #10 of the ship. They left from Royal Caribbean's Cape Liberty Cruise Port in Bayonne, New Jersey and cruised directly to Bermuda without making any stops. At the end of the trip Plaintiffs cruised directly back, without making any stops, from Bermuda to Royal Caribbean's Cape Liberty Cruise Port in Bayonne, New Jersey.

**June 21, 2007** – On the last night of their cruise, Thursday, June 21, 2007, at approximately 7:30 p.m., the Plaintiffs were in their cabin getting ready to go to dinner. Susan was at the vanity at that time drying her hair using the hair dryer supplied by Royal Caribbean in their cabin. She was holding the hairdryer in her left hand. While Susan was using the hairdryer, the said hairdryer suddenly sparked, stopped working, and shut off. As a result of the foregoing Susan was electrocuted. She felt a sensation in her left hand which traveled up her left arm to her shoulder, and the hairdryer stuck to her left hand. Her left hand was burned and charred, and the hairdryer was burned and charred as a result of the incident which had occurred. The hair dryer malfunctioned and electrocuted or otherwise injured Susan thereby causing her severe and permanent injury. In her deposition Susan testified that on a scale of one to ten the pain was a six.

**June 21, 2007** – On June 21, 2007, immediately after the foregoing occurrence, Susan and Michael left their cabin and sought medical treatment from Royal Caribbean. Susan was treated with Silvadene crème for the burn and Advil for the pain. When Susan and Michael returned to their cabin the hairdryer was gone, having been taken and spoliated by Royal Caribbean, never to be seen again.

**June 21, 2007** – After seeking medical treatment from Royal Caribbean and completing an accident report for Royal Caribbean, Susan and Michael then returned to their cabin, with the intention of taking pictures of the hair dryer and securing same to be utilized as evidence of what had happened. When they returned to their cabin they found that the hair dryer was gone and that it had been replaced by a brand new hair dryer. As such, Plaintiffs did not originally know the make or model of the hair dryer which caused Plaintiffs' injuries, and they have no pictures of the actual hair dryer which injured Susan (they have since obtained, however, pictures of the make, model, and type of the hair dryer which injured Susan).

**June 22-July 23, 2007** – From June 22, 2007 to July 23, 2007 Susan was treated by her own doctors, Dr. Michele Howe and Dr. Allen Shalit. Her fingers were numb and tingling and she

had pain and discomfort in her left arm and shoulder. They treated her for a nerve injury and sent her to a neurologist, Dr. Robert Wagner.

**July 23 & 27 2007** – On and after July 23, 2007 Susan was treated by a neurologist, Dr. Robert Wagner. Dr. Wagner became Susan's treating physician at that time. On or about July 27, 2007, Susan returned to Dr. Wagner for a second visit. The July 6, 2010 narrative report of Dr. Wagner is discussed further below. Dr. Wagner advised Susan that her left hand and arm were hypersensitive, particularly to cold temperatures/weather/wintertime, and that this hypersensitivity may be permanent. He tested her left arm and compared it to her right arm in order to make this determination. He increased her dosage of Lyrica from the 50 milligrams which Dr. Shalit had prescribed up to 75 milligrams during the day, and, in addition, he prescribed 150 milligrams to be taken at night.

**August 31, 2007** – On or about August 31, 2007 Susan returned for her third visit with Dr. Wagner. She continued to treat with Dr. Wagner on or about August 31, 2007 and thereafter, returning approximately every three months for visits.

**September 5, 2007** – On or about September 5, 2007, Susan returned to Dr. Wagner. He increased her dosage of Lyrica at that time. He increased the dosage to 75 milligrams with breakfast and 75 milligrams with lunch (for a total of 150 milligrams during the day), and 75 milligrams with dinner and 150 milligrams before bed (for a total of 225 milligrams at night). Susan continued to treat with Dr. Wagner after September 5, 2007, returning for visits approximately every three months.

**April 29, 2008** – Susan saw Dr. Wagner again on April 29, 2008. As of that day and to this day Susan continues to have some loss of use of her pinky and ring finger on her left hand. She has pain and numbness in her left fingers/hand and arm, particularly in cold temperatures, where her hand turns black. All of these symptoms were caused by the incident in this case as there is no preexisting injury to Susan Latronica's left hand or arm.

      6.    Plaintiffs' claim that their lives have been permanently changed/adversely affected by the condition from which Susan now suffers. Plaintiffs have suffered a loss of enjoyment of life and loss of consortium in this regard. Susan claims she is no longer able to do the exercises with the injury to her left hand and arm. In cold weather/temperatures, her left hand turns black. When it turns black, she experiences pain and numbness. Susan has difficulty picking things up, sometimes cannot pick up things at all, and many times drops things because her left hand goes down. She does not have the same level of sensation and feeling in her left hand in this regard. Oftentimes the pain in her left hand increases when she does try to pick

things up or perform household chores. Plaintiffs no longer have sexual relations with the same frequency that they did before Susan's injuries. As a result of the foregoing Susan suffers from mild bouts of depression. She feels as if she has let her husband and her boys down and gets depressed in this regard.

## PLAINTIFFS' EXPERT REPORTS

7.    Plaintiffs have obtained narrative reports from Susan's treating physician, Dr. Robert Wagner ("**Wagner**"), and from Dr. David Anschel ("**Anschel**"), as follows.

(a)    **Dr. Robert Wagner** – In Dr. Wagner's report, (the "**Wagner Narrative Report**"), he states "at that point, in January of 2009 I had suggested that she get a second opinion from a physician who specializes in reflex sympathetic dystrophy or complex regional pain syndrome, which I felt was likely the syndrome the patient was suffering from." He also states that "it does appear that the patient is suffering from a nerve injury, possibly in a small fiber distribution based on the quality of the pain as well as the fact that no obvious, abnormalities were found on previous nerve conduction testing. It seems that the timing of the symptoms does correspond to the use of the hair dryer that she described when on the cruise ship. She has had persistent discomfort and has had to use pain medication throughout the course since July of 2007." A copy of the Wagner Narrative Report, dated July 6, 2010, is annexed hereto as **Exhibit B**.

(b)    **Dr. David Anschel** – In Dr. Anschel's initial narrative report (the "**Anschel Initial Report**"), he opines that Plaintiff is suffering from reflex sympathetic dystrophy also known as complex regional pain syndrome ("**CRPS**"). As

5

discussed further below, Plaintiffs did not have Dr. Anschel opine on causation in this Initial Report due to Plaintiffs' understanding that causation was included in the liability stipulation which had earlier been entered into between the parties (discussed further below), such that causation was not going to have to be proven by Plaintiffs at the plenary hearing on damages called for by the liability stipulation. *See* the last page of Dr. Anschel's Initial Report for his description of what CRPS is and how Susan is suffering from same.  See also the absence of any discussion in the Anschel Initial Report of causation.  A copy of the Anschel Initial Report, dated July 7, 2014, is annexed hereto as **Exhibit C**.

(c)     **Dr. David Anschel** – During subsequent proceedings in this case (discussed further below), after the issuance of Dr. Anschel's Initial Report, Royal Caribbean advised of its position that causation still did have to be proven at the contemplated plenary hearing on damages, even though the word "causation" and the concept of "causation" had been specifically negotiated out of the liability stipulation by Plaintiffs (see further discussion below).  Nonetheless, because Royal Caribbean has now taken the position that causation does still have to be proven at the hearing on damages (something which Plaintiffs do not concede), Plaintiffs took the initiative and went out and obtained a supplemental report from Dr. Anschel, to supplement his Initial Report, to opine on causation – as Plaintiffs did not ask him to opine on causation in his Initial Report based on their having negotiated causation out of the liability stipulation, and their corresponding belief that causation was not going to have to be proven at the hearing on damages. Thus, in his supplemental report (the "**Anschel Supplemental Report**") Dr.

6

Anschel opines that "[t]here is no pre-existing history of the symptoms exhibited by Ms. Latronica as described herein and in my July 7, 2014 report. These symptoms indicate that she suffered a nerve injury on June 21, 2007, and has developed CRPS as a result of the June 21, 2007 incident, and I find to a reasonable degree of medical certainty that her nerve injury and CRPS were in fact caused by the June 21, 2007 incident based thereon and based on the fact that the symptoms are consistent with a nerve injury and CRPS." A copy of the Anschel Supplemental Expert Report, dated February 6, 2015, is annexed hereto as **Exhibit D**.

8.    As discussed below, Plaintiffs obtained Dr. Wagner's narrative report for use in this case. However, on a number of occasions Plaintiffs' counsel advised and discussed with the various Magistrate Judges in this case that an updated report was going to be necessary because (i) at the time of Dr. Wagner's report discovery was not complete – Defendants' depositions were still being attempted, even though they were ultimately never conducted, (ii) the length of time this case was taking (the case is now seven years old having been started in State Court in 2008 before later being removed to this Court), and (iii) the further development of Susan's condition during that passage of time, including relating to whether or when Susan's condition had or had not plateaued, the status of her condition, and the permanency thereof regardless of when it plateaued.

9.    When the time came to obtain updated reports I personally traveled to the office of Dr. Wagner, on June 11, 2014, to meet with him to discuss the status of Susan's condition and what I anticipated to be his updated report in this regard. At that meeting Dr. Wagner advised me, for the first time, that because he was not generally a testifying doctor he was unwilling to

provide the updated report, and was unwilling to further serve as Plaintiff's expert in this case, despite having provided his Narrative Report back on July 6, 2010. Accordingly, Plaintiffs were forced to go out and find a new doctor to act as their expert, and identified Dr. Anschel in this regard. By this time, however, the liability stipulation had already been entered into between the parties (dated March 1, 2013), such that when Plaintiffs retained Dr. Anschel in 2014 to prepare his initial report they did not ask Dr. Anschel to opine on causation, believing that causation was not an element which needed to be proved at the contemplated proof hearing on damages in that Plaintiffs had negotiated causation out of the liability stipulation. Dr. Anschel's initial report (**Exhibit C**) therefore does not opine on causation.

10.     When Royal Caribbean subsequently advised of its position that causation did still need to be proven at the proof hearing on damages, Plaintiffs diligently took the initiative and went out and obtained the Supplemental Report from Dr. Anschel, supplementing his initial report to include his opinion on causation. See **Exhibit D**.

11.     Substantially contemporaneous with Plaintiffs learning that Royal Caribbean was taking the position that causation needed to be proven at the proof hearing on damages, Plaintiffs also learned that Royal Caribbean was taking the position that Dr. Anschel's Initial Report could not be used in this case because formal leave to utilize same had not been obtained by Plaintiffs. Plaintiffs dispute this position, but by way of this motion seek to cure both defects which Royal Caribbean believes exist (although Plaintiffs dispute there are any defects at all), the two alleged defects sought to be cured being that (a) Dr. Anschel's Initial Report cannot be used in this case because leave to utilize same was never obtained, and (b) Dr. Anschel's Initial Report is defective in any event because it does not opine on causation. Plaintiffs seek to cure these alleged defects (if they are defects at all) by seeking formal leave to use Dr. Anschel's Initial

8

Report as Royal Caribbean believes such formal leave is necessary, and by leave to utilize Dr. Anschel's Supplemental Feport as it sets forth the causation opinion not contained in Dr. Anschel's Initial Report.

12.     By this Motion, Plaintiffs seek to serve Dr. Anschel's new/amended expert medical reports dated July 7, 2014 and February 6, 2015.

### PROCEDURAL HISTORY RELATING TO EXPERT REPORTS

13.     Plaintiffs take this opportunity to set forth here the procedural history of this case as same is relevant to their right/need to serve supplemental expert reports at this time. Through no fault of their own, this case has taken seven years to this point, during which time Susan's condition has continued to develop and worsen, thereby necessitating the need for updated medical reports.  Throughout the course of this case Plaintiffs have advised the Court and counsel that there would be a need to update medical reports at the appropriate time, with little or no objection until the present issues were recently raised by Royal Caribbean thereby necessitating this motion.  The procedural history and lengthy passage of time is therefore relevant to show the need for updated medical reports, that the delays have not been caused by Plaintiffs, and how Plaintiffs will suffer merits prejudice if they are not provided an opportunity to serve updated medical reports (in that the statutes of limitations on their claims have long since passed such that no new action can be filed if they are precluded from offering updated medical reports on the current status of Susan's condition at the proof hearing on damages).  For these reasons Plaintiffs' present motion should be granted.

14.     Chronologically, Plaintiffs filed this case in the Superior Court of New Jersey, Law Division, Passaic County, on or about June 9, 2008.  Plaintiffs sued the retailer Royal Caribbean, as well as the distributor and manufacturer of the hair dryer, although the identity of

the distributor and manufacturer were not known to Plaintiffs at that time, such that the distributor and manufacturer had to be named as John Doe Defendants.

15.     Plaintiffs proceeded to take discovery of Royal Caribbean to learn the identity of the distributor.  Royal Caribbean advised that it did not know the identity of the manufacturer, such that the manufacturer could still not be named by identity at that time.

16.     Plaintiffs amended the distributor into the case based on the discovery obtained from Royal Caribbean, the distributor being Jerdon Products, LLC ("Jerdon").

17.     Upon filing its answer Jerdon promptly moved for summary judgment.  Jerdon moved for summary judgment before discovery was conducted, such that Plaintiffs were forced to litigate an early, pre-discovery, summary judgment motion in a tort/negligence/product liability case.  Not surprisingly, Jerdon's summary judgment motion was denied, after which Plaintiffs were first able to engage in meaningful discovery, including attempting to elicit from Jerdon the identity of the manufacturer of the hair dryer which electrocuted Susan.

18.     Jerdon identified Elec-Tech International Co. Ltd. ("Elec-Tech") as the manufacturer.  Elec-Tech was located in the Orient.  Accordingly, Plaintiff had to serve Elec-Tech under the Hague Convention, a process which took approximately eight to ten months.

19.     Upon effecting service of Elec-Tech, on December 7, 2009 Elec-Tech removed this case to this Court.

20.     After the removal to this Court, on May 4, 2010 this Court conducted the first of what would be eleven status/case management type conferences in this case.  These ongoing conferences with the Court are material herein because they events at the conferences evidence an ongoing theme raised by Plaintiffs at these conferences that extensions of time were going to be needed for both updated medical expert reports and for liability reports.  With respect to the

need for updated medical expert reports, Plaintiffs generally reported to the Court and counsel that such updated medical reports were going to be necessary because of the ongoing development of Susan's condition during the passage of time in this case. With respect to the need for extensions of time relative to liability expert reports, those extensions were needed because the retailer defendant Royal Caribbean could not easily produce its employees/representatives for depositions because they are seaman located on ships travelling around the world, and were thus not easily accessible for depositions. This includes the medical personnel who treated Susan on June 21, 2007 when Susan was electrocuted. Continuous extensions were granted to the parties because of Royal Caribbean's good faith but ultimate unsuccessful efforts to produce their personnel for depositions. To this day not one Royal Caribbean representative has been deposed because they are unavailable for depositions. Royal Caribbean's unavailability for depositions is ultimately what lead to the inception of discussions towards the liability stipulation more fully discussed below.

21.     The passage of time in this case was further aggravated by the following. Once Plaintiffs served the manufacturer Elec-Tech under the Hague Convention in the Orient, and once Elec-Tech appeared, Elec-Tech answered and discovery resumed. (There was a de facto if not formal stay of discovery until the manufacturer was in the case so that discovery would not have to be duplicated once the manufacturer Elec-Tech was in the case).

22.     Once Elec-Tech was in the case and some discovery was conducted it was determined that, contrary to what the distributor Jerdon had reported to Plaintiffs, Elec-Tech was not the manufacturer of the subject hair dryer. Instead, Jerdon reported that it had honestly mistaken Elec-Tech as the manufacturer, when the true manufacturer of the hair dryer was Defendant Oriental Universe ("Oriental"). Accordingly, Plaintiff had to make application to the

11

Court for leave to amend to add Oriental into the case, and the de facto or formal stay of discovery had to be put back in place herein (at various times during the last seven years the stay of discovery was de facto and at other times it was formal), so that Plaintiff could serve Oriental under the Hague Convention in the Orient, taking another approximate eight to ten months.

23.     Ultimately Oriental was served and defaulted in the case.  After Oriental defaulted the parties resumed attempting to secure Royal Caribbean's depositions, which efforts were unsuccessful.

24.     The foregoing issues were all addressed with this Court at the eleven status conferences which took place with the Court, the results of which conferences reflect the ongoing theme concerning the need to extend discovery deadlines, including the deadlines for updated medical expert reports and liability reports to the present.  A summary of the eleven status conferences which took place during this time is as follows.

25.     The initial Rule 16 scheduling conference took place in this case on May 4, 2010 before Magistrate Judge Esther Salas.  On May 6, 2010, the Court entered its Pretrial Scheduling Order (the "**Scheduling Order**") [Dkt. #13].

26.     Pursuant to the Scheduling Order, the parties were required to deliver affirmative expert reports by January 6, 2011 (the "**Expert Report Deadline**").  *See* Scheduling Order at ¶ 11.

27.     Subsequently, on July 13, 2010, a status conference was held before Magistrate Judge Salas (the "**July 13, 2010 Status Conference**").

28.     Thereafter, on October 13, 2010, a status conference was held before Magistrate Judge Salas (the "**October 13, 2010 Status Conference**").  At the October 13, 2010 Status Conference, the Court advised that, once Oriental appeared in the case, the Court would entertain

12

an amended scheduling order addressing the dates for the service of affirmative expert reports, responsive expert reports, close of discovery, and any other dates which need to be addressed as a result of a new party appearing in the case. Magistrate Judge Salas "so ordered" Plaintiff's correspondence confirming this discussion on the docket. *See* Letter Order, dated October 26, 2010 [Dkt. 27].

29.     A subsequent status conference was scheduled for January 14, 2011 (the "**January 14, 2011 Status Conference**"). As discussed below, at this conference, the correct manufacturer defendant had still not appeared in the case. Prior to the January 14, 2011 Status Conference, Plaintiffs advised the Court that they believed the parties had completed all discovery/pre-trial proceedings that could have been completed without the manufacturer defendant, and that it would not have been practical to conduct any depositions before knowing whether the manufacturer defendant intends to appear in the case because such manufacturer defendant would have the right to participate in any depositions, such that any depositions taken before it was known whether manufacturer defendant would appear might have to be repeated if it subsequently appeared in the case. In addition, Plaintiffs advised that they could not prepare certain expert reports without the manufacturer defendant in the case since Plaintiffs needed discovery of the manufacturer to be used in connection with work on their reports. *See* Seidman Correspondence to Court, dated January 5, 2011 [Dkt. #28].

30.     After the January 14, 2011 Status Conference, Magistrate Judge Salas entered an order that, *inter alia*, provided that the Court's May 6, 2011 Scheduling Order was hereby amended as follows:

- The parties shall have 90 days from January 14, 2011, or until April 14, 2011, to complete fact discovery in this case, and April 14, 2011 is the new fact discovery deadline in this case;

13

- The parties shall have 30 days from April 14, 2011, or until May 13, 2011, to serve affirmative liability expert reports in this case; and

- The parties shall have 30 days from May 13, 2011, or until June 13, 2011, to serve responding liability expert reports in this case.

*See* Order Regarding Serving Oriental Universe and Amending Pre-Trial Scheduling Order, dated February 24, 2011 (the "**February 24, 2011 Order**") [Dkt. 34].

31.     On April 14, 2011, a status conference was held before Magistrate Judge Salas (the "**April 14, 2011 Status Conference**").   No material events relevant to this motion took place at this conference.

32.     On May 19, 2011, a status conference was held before Magistrate Judge Esther Salas (the "**May 19, 2011 Status Conference**").   After the May 19, 2011 Status Conference, Magistrate Judge Salas entered the Amendment to Pretrial Scheduling Order, dated June 7, 2011 [Dkt. #41] that provided, in part, that:

> 2.     Expert Reports.   All affirmative expert reports shall be delivered by October 25, 2011.  All responding expert reports shall be delivered by November 24, 2011.
>
> 3.     The parties shall complete expert discovery, including depositions of all experts, no later than January 16, 2012.

*See* Amendment to Pretrial Scheduling Order, dated June 7, 2011 [Dkt. #41].

33.     Subsequently, the parties requested that the Court extend the then current discovery schedule for another 60 days.  *See* G. Arnott Correspondence to Court, dated October 21, 2011 [Dkt. #48].   In this letter counsel for Royal Caribbean advised the Court that, due to multiple scheduling conflicts, Plaintiffs' depositions had been delayed. During discovery, Plaintiffs noticed Royal Caribbean for depositions under Rule 30(b)(6) and commenced efforts to schedule same.   However, Royal Caribbean advised that their witnesses are not citizens of the United States, do not reside in the United States, are seamen upon vessels traveling all over the

14

world, such that they cannot be easily and conveniently deposed.  This includes (as it relates to damages and medical reports) the medical professionals that treated Susan on board after the incident.  Plaintiffs understood that there may be approximately five to ten different people Royal Caribbean would need to designate to produce for depositions in this matter.  Another discovery issue (that relates to both liability and damages) discussed at this conference was the fact that Royal Caribbean spoliated the hairdryer such that it was not available for inspection and testing.

34.    Thereafter, Magistrate Judge Joseph A. Dickson entered the Amendment to Pretrial Scheduling Order, dated October 24, 2011 [Dkt. #49] that provided, in part, that:

> 2.    Expert Reports.  All affirmative expert reports shall be delivered by January 31, 2012.  All responding expert reports shall be delivered by January 31, 2012.
>
> 3.    The parties shall complete expert discovery by March 2, 2012, including depositions of all experts, no later than April 30, 2012.

*See* Amendment to Pretrial Scheduling Order, dated October 24, 2011 [Dkt. #41].

35.    On December 19, 2011, a status conference was held before Magistrate Judge Dickson (the "**December 19, 2011 Status Conference**").  At the December 19, 2011 Status Conference I advised that at the appropriate time updated medical reports were going to be necessary due to the passage of time and the development of Plaintiffs' condition during the delays.  Although no timetable was set, there was a general acknowledgement that this was ultimately going to be necessary, but was premature at that point.

36.    After the December 19, 2011 Status Conference, Magistrate Judge Dickson entered a text order providing that "End of fact discovery is extended to 2/29/12. Stay of discovery until 2/15/12. Telephone Status Conference set for 2/28/2012 03:00 PM before

Magistrate Judge Joseph A. Dickson." [Dkt. #51].  The purpose of Magistrate Judge Dickson scheduling matters this way was to place a stay on discovery, yet make the end of discovery beyond the stay date, with a conference to be set before the end of discovery, so that a new discovery end date could be set.  The chronology was thus that discovery would end February 29, 2012, with a telephone conference to take place the day before on February 28, 2012 so that the February 29 date could be extended, and with the stay to be in place until February 15, 2012. This is consistent with the advices I gave that updated medical expert reports were ultimately going to be necessary, and with the discussion which took place that even if ultimately necessary they were premature at that time.

37.   At the February 28, 2012 status conference before Magistrate Judge Dickson (the "**February 28, 2012 Status Conference**"), the parties discussed scheduling further.   On February 29, 2012, Magistrate Judge Dickson entered a text order extending fact discovery for 90 days and providing that affirmative expert reports are due 30 days after close of fact discovery and rebuttal reports are due 30 days thereafter.  [Dkt. #53].

38.   At the May 8, 2012 status conference before Magistrate Judge Dickson (the "**May 8, 2012 Status Conference**"), the parties reported additional delays which occurred, particularly that Royal Caribbean still could not produce its people for depositions. Without these depositions I again reiterated the need for additional time for expert reports.

39.   On May 29, 2012, Judge Dickson entered a new Scheduling Order (the "**May 2012 Scheduling Order**") that provided, *inter alia,*

> 1.   **ORDERED**, that fact discovery be, and hereby is, extended for four months from the time of the May 8, 2012 conference up through and including September 10, 2012.

> 2.   **ORDERED**, that within one month of September 10, 2012, by on or before October 12, 2012, Plaintiffs shall serve any

16

liability report they obtain in this matter and any additional damages expert reports they obtain in this matter.

3.      **ORDERED**, that within one month of October 12, 2012, by on or before November 12, 2012, Defendants shall serve any liability or additional damages expert reports they obtain in this case.

4.      **ORDERED**, that within one month of November 12, 2012, by on or before December 12, 2012, the parties shall conduct any expert depositions they desire to take in this case.

*See* May 2012 Scheduling Order [Dkt. #55].

40.      At the July 12, 2012 status conference before Magistrate Judge Dickson (the "**July 12, 2012 Status Conference**"), the parties reported that Royal Caribbean still could not produce its people for depositions, and that it now appeared those individuals might never be deposed. Without those depositions liability reports still could not be prepared, nor could updated medical reports be prepared, such that it proved impossible for the parties to comply with the May 29, 2012 Scheduling Order which had been entered. It was in connection with this conference, when the parties realized that Royal Caribbean would likely never be able to produce its witnesses for depositions, that the parties began discussing the liability stipulation pursuant to the terms of which (a) Royal Caribbean would stipulate to liability, (b) Plaintiffs would waive their right to a jury trial, and (c) a proof hearing on damages would take place (and with updated medical reports on damages to be obtained prior to the proof hearing on damages).

## THE LIABILITY STIPULATION

41.      As discussed above, Royal Caribbean could not produce in discovery certain information Plaintiffs would need to properly and thoroughly prove causation (and liability). Specifically, Royal Caribbean (i) spoliated the hairdryer such that it was not available for

inspection and testing, and (ii) could not produce its employees/representatives for depositions because they are seaman located on ships around the world.

42.     In order to settle these issues Plaintiffs and Royal Caribbean entered into a liability stipulation whereby (i) a plenary hearing (without a jury) would take place before the District Judge between Plaintiffs and Royal Caribbean strictly on the damages suffered by Plaintiffs as a result of this occurrence (not on duty, breach, nor causation – only damages), (ii) with Plaintiffs and Royal Caribbean agreeing to abide by whatever the District Judge found the appropriate amount of damages to be.

43.     The parties engaged in substantial negotiations on these issues and the resulting Stipulation and Proposed Order (the "**Stipulation**") was agreed to pursuant to various conferences which were had with Magistrate Judge Dickson leading up to the final terms of the Stipulation itself.  A copy of the Stipulation is annexed hereto as **Exhibit E**.

44.     Accordingly, on March 1, 2013, I forwarded the Stipulation to Magistrate Judge Dickson to be entered as an Order.  See **Exhibit E**.  However, the Court decided not to enter the Stipulation as an Order in order to obviate the need to set a trial date.  Instead, the Court first ordered this case to be mediated under the Court's mediation program and then, when the mediation was unsuccessful, ordered the case to arbitration.  As a result, a trial date/proof hearing date for the plenary on damages has not been set yet in this matter.  No trial date has ever been set.

45.     The Stipulation includes all three elements of duty, breach, and causation.  The reason the Stipulation included causation is because of Royal Caribbean's inability to produce certain information detailed above in discovery (the hair dryer and its witnesses).  Royal

18

Caribbean stipulated as to liability (including causation) in exchange for which Plaintiffs waived their right to a jury trial, with the parties agreeing on a plenary hearing on damages only.

46.     The evidence which proves that causation is included in the liability stipulation and is not an element which Plaintiffs have to prove at the plenary hearing is annexed hereto as is **Exhibit F, Exhibit G, and Exhibit E** annexed hereto and discussed further as follows.

47.     **Exhibit F** is the email and first draft of the liability stipulation which defense counsel, Gordon Arnott, Esq., drafted and emailed to us which contained a clause requiring Plaintiffs to prove causation at the plenary hearing.

48.     **Exhibit G** are the notes from my December 20, 2012 telephone call to Mr. Arnott wherein I requested that he take the causation requirement out of the draft stipulation, in response to which Mr. Arnott stated to me that "he will ask his people about taking out [the] causation language and just reserving his right to prove preexisting injuries – which is his real concern." That Mr. Arnott's real concern was preserving his right to prove pre-existing injuries is also borne out by the unusual way he drafted the causation clause in the first draft of the liability stipulation (**Exhibit F**). To accommodate Plaintiffs' position that they not have to prove causation and Royal Caribbean's position that it reserve its right to prove pre-existing injuries Mr. Arnott's first draft actually attempts to split the causation into two parts, one where Plaintiffs would not have to prove causation and one where Royal Caribbean preserves its right to prove pre-existing injuries. *See* **Exhibit F**.

49.     **Exhibit E** is the final signed liability stipulation itself and my letter to Magistrate Judge Dickson sending that liability stipulation into the Court for filing.  This final signed version of the liability stipulation does not have the causation provision in it as it was negotiated out of the stipulation by me.  My cover letter to Magistrate Judge Dickson specifically says that

the "plenary hearing (without a jury) would take place before the District Judge between Plaintiffs and Royal Caribbean strictly on the damages suffered by Plaintiffs as a result of this occurrence (not on duty, breach nor causation – only damages) ... ." In response to my letter to Magistrate Judge Dickson Royal Caribbean's counsel **DID NOT** write to the Magistrate Judge indicating that the afore-quoted passage referencing causation as being included in the liability stipulation was in any way incorrect.

## MEDIATION AND ARBITRATION

50.    After the submission of the stipulation to Magistrate Judge Dickson, on September 3, 2013, an Order was entered referring the case out for mediation. *See* Dkt. #56.

51.    During the course of mediation, the parties again discussed the need for updated medical reports regarding the status of Susan's injuries as counsel and the Magistrate Judges had previously discussed.   The mediator asked defense counsel if Royal Caribbean wanted an updated exam (IME) of Susan, to which defense counsel responded that he did.   Defense counsel and I agreed that Susan would again be examined by Royal Caribbean's doctor, and we agreed that updated medical reports would be exchanged.   Defendant's doctor did examine Plaintiff again (on February 20, 2014), and he then issued his updated report as to Plaintiff.   Annexed as **Exhibit H** is Defendant's doctor's first report dated August 31, 2011, with his updated report dated February 20, 2014 (after the February 20, 2014 IME)  being annexed as **Exhibit I**.

52.    The existence of Defendant's updated medical report evidences the agreement of counsel at the mediation that, at long last, the time was finally ripe for updated medical reports, and that such updated reports would be obtained.   Despite the fact that Royal Caribbean has its updated report in hand (**Exhibit I**), it is nonetheless objecting to the Initial Anschel Report (which was Plaintiff's updated report at the time).

53.     Thus, it was after the aforementioned agreement reached at the mediation that I contacted Dr. Wagner to obtain from him a supplemental report updating the status of Susan's injuries.  I traveled to Dr. Wagner's office to meet him on June 11, 2014 in this regard.  At that meeting, Dr. Wagner informed me for the  first time that he did not wish to be a testifying witness and refused to provide an updated report.  Accordingly, Plaintiffs located Dr. Anschel, and obtained his Initial Report as their updated report at that time, to update the status of Susan's injuries in the nearly four years since the Wagner Narrative Report.  Importantly, because Plaintiffs' understanding was that the Stipulation had resolved the issue of causation, Plaintiffs requested that Dr. Anschel not opine on causation.  See Dr. Anschel's Initial Report, **Exhibit C**.

54.     After the mediation proved unsuccessful, Magistrate Judge Clark referred the case to arbitration on April 25, 2014.  *See* Dkt. #62.  At the arbitration hearing held on July 16, 2014, counsel for Royal Caribbean refused to accept the Anschel Initial Report.  Moreover, defense counsel contended that the Stipulation did not resolve the issue of causation in this matter.  He posited that Plaintiffs still needed to prove causation in this case.

*55.*     Subsequent to the August 8, 2014 arbitration award, Royal Caribbean requested a *trial de novo,* and a status/settlement conference was held before Magistrate Judge James B. Clark on January 7, 2015.

56.     At the January 7, 2015 status/settlement conference Royal Caribbean again both (a) objected to the Anschel Initial Report as untimely, and (b) contended that causation needed to be proven at the proof hearing on damages.  Plaintiffs disputed both of these issues, arguing that the Anschel Initial Report was the updated report that the parties had agreed would be obtained at the mediation, and that causation was not an element to be proven at the plenary hearing as the

need to prove causation had been negotiated out of the stipulation by Plaintiffs (which is why Plaintiffs did not have Dr. Anschel opine on causation in his Initial Report).

57.     As a result of these issues, in connection with the January 7, 2015 conference, Magistrate Judge Clark granted the Plaintiffs leave "to file a motion to serve a new/amended expert medical report."

58.     As stated above, because causation is included in the liability Stipulation (i.e. there is no need to prove causation at the plenary hearing), Plaintiffs did not have their expert doctor Anschel opine on causation in his Initial Report.  That Plaintiffs did not have their doctor opine on causation is additional evidence that Plaintiffs always understood causation to be included in the liability stipulation.  It also means that if this Court now requires Plaintiffs to prove causation at the plenary hearing that Plaintiffs will need relief in the form of an opportunity to obtain a supplemental report on causation.  Plaintiffs have taken the initiative and gone out and gotten that report on causation in the form of Dr. Anschel's Supplemental Report (**Exhibit D**) which opines on causation.  Plaintiffs have been diligent in this regard, so as not to delay this seven year case any further.

59.     Plaintiffs also reserve their right to request a jury if they are required to prove causation as the *quid pro quo* for Plaintiffs giving up their right to a jury was the fact that they would not have to prove causation.

## **PREJUDICE AND EQUITIES**

60.     Throughout this matter Plaintiffs have diligently pursued their rights while Defendants have (a) given the name of the wrong manufacturer, (b) spoliated the hair dryer, and (c) been unable to produce their witnesses for depositions.

61.     Despite these circumstances, and despite the fact that Plaintiffs will suffer merits prejudice if they are precluded from using the Anschel Initial Report and the Anschel Supplemental Report, Royal Caribbean seeks to preclude Plaintiffs from utilizing these reports. Plaintiffs will suffer merits prejudice without the use of these reports as they will be precluded from providing expert testimony at the contemplated proof hearing on damages regarding both (i) the current state of Plaintiff's medical condition, and (ii) causation – to the extent that the trial judge rules causation might need to be proven.

62.     To the contrary, Royal Caribbean will suffer no prejudice if the present motion is granted.   Considering these equities and the weighing of the prejudices, Plaintiffs' present motion should in all respects be granted.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: February 6, 2015                          /s/ Mitchell B. Seidman
                                                 Mitchell B. Seidman

23

# EXHIBIT "A"

**SEIDMAN & PINCUS, LLC**
777 Terrace Avenue, Fifth Floor
Hasbrouck Heights, New Jersey 07604
Phone: (201) 473-0047
Fax:    (201) 288-7009
*Attorneys for Plaintiffs*

*See interrogatory #2*
*starting on p. 2*

| | |
|---|---|
| SUSAN LATRONICA and MICHAEL LATRONICA, <br><br> Plaintiffs, <br><br> vs. <br><br> ROYAL CARIBBEAN CRUISES, LTD.; ROYAL CARIBBEAN INTERNATIONAL, JERDON PRODUCTS, LLC, JOHN DOE DEFENDANT #3, JOHN DOE DEFENDANT #4, JOHN DOE DEFENDANT #5, and JOHN DOE DEFENDANTS #6 THROUGH #15, <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY PASSAIC COUNTY:LAW DIVISION DOCKET NO. L-2468-08 <br><br> *CIVIL ACTION* <br><br> **PLAINTIFFS' ANSWERS TO FORMS A AND A(2) UNIFORM INTERROGATORIES** |

Plaintiffs hereby answer Forms A and A(2) Uniform Interrogatories as follows:

## GENERAL OBJECTIONS

1.    Plaintiffs object to each interrogatory that seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

2.    Plaintiffs object to each interrogatory that seeks information that is protected from disclosure by the attorney-client privilege, the work-product-doctrine, or any other privilege or protection.

3.    Plaintiffs object to each interrogatory that is unduly burdensome or would require Plaintiffs to make an unreasonably expensive investigation.

4.    Plaintiffs object to each interrogatory that is overly broad, vague, and/or ambiguous.

5.      Plaintiffs object to each interrogatory that seeks information that is already within Defendant's possession, custody and/or control.

6.      Plaintiffs object to each interrogatory that seeks information that is a matter of public record and is thus as available to Defendant as it is to Plaintiffs.

7.      Plaintiffs object to each interrogatory that seeks to impose any obligation or duty beyond those imposed by the applicable rules of court.

## SPECIFIC ANSWERS TO FORM A UNIFORM INTERROGATORIES

1.      Susan Latronica, 307 Wooley Road, West Milford, New Jersey 07480, January 30, 1971.

2.      Plaintiffs' chronological version of the accident or occurrence is as follows.

**December 2006** – Sometime during December of 2006 Plaintiffs determined to take a cruise vacation in the Caribbean. At that time they booked a trip on line directly with Royal Caribbean, not through any travel agency. The trip which they booked was a five day cruise to Bermuda which left on Father's Day, June 17, 2007, and was scheduled to return on June 22, 2007.

**June 17, 2007** – On June 17, 2007 the Plaintiffs left with Royal Caribbean on their five day cruise trip to Bermuda. The name of the ship which they cruised on was the "Explorer Of The Seas". Their cabin was cabin #1234 on deck #10 of the ship. They left from Royal Caribbean's Cape Liberty Cruise Port in Bayonne, New Jersey and cruised directly to Bermuda without making any stops. At the end of the trip Plaintiffs cruised directly back, without making any stops, from Bermuda to Royal Caribbean's Cape Liberty Cruise Port in Bayonne, New Jersey.

**June 21, 2007** – On the last night of their cruise, Thursday, June 21, 2007, at approximately 7:30 p.m., the Plaintiffs were in their cabin getting ready to go to dinner. Susan was at the vanity at that time drying her hair using the hair dryer supplied by Royal Caribbean in their cabin. She was holding the hair dryer in her left hand. While Susan was using the hair dryer, the said hair dryer suddenly stopped working, shut off, and sparked. As a result of the foregoing Susan was, among other things, electrocuted. She felt a sensation in her left hand which traveled up her left arm, and the hair dryer stuck to her left hand. Her left hand was burned and charred, and the hair dryer was burned and charred as a result of the incident which had occurred. The hair dryer malfunctioned and electrocuted or otherwise injured Susan thereby causing her severe and permanent injury.

**June 21, 2007** – On June 21, 2007, immediately after the foregoing occurrence, Susan left her cabin and sought medical treatment from Royal Caribbean. After receiving medical treatment she proceeded directly to report the incident to Royal Caribbean. She completed an accident report dated June 21, 2007 for Royal Caribbean.

**June 21, 2007** – After seeking medical treatment from Royal Caribbean and completing an accident report for Royal Caribbean, Susan and Michael then returned to their cabin, with the intention of taking pictures of the hair dryer and securing same to be utilized as evidence of what had happened. When they returned to their cabin they found that the hair dryer was gone and that it had been replaced by a brand new hair dryer. As such, Plaintiffs did not originally know the make or model of the hair dryer which caused Plaintiffs' injuries, and they have no pictures of the hair dryer which injured Susan (they do, however, have pictures of the make, model, and type of the hair dryer which injured Susan).

**June 22, 2007** – On June 22, 2007 the Plaintiffs returned home.  Susan's own doctor was not in on that day.  Accordingly, in lieu of seeing her own doctor that day, she sought medical treatment from the following health care provider:

> Michele H. Howe, DO
> Medical Director
> Valley Health Medical Group
> 72 Hamburg Turnpike
> Riverdale, NJ 07457
> Phone: 973-835-7290
> Fax:    973-835-0696

**June 22/23, 2007** – After Susan's visit to Dr. Howe on June 22, 2007, on June 22, 2007 and/or June 23, 2007, a bump developed on Susan's arm and the pain in her left hand and arm was worsening.  In addition, her fingers became numb.  Accordingly, on June 23, 2007 Susan returned to Dr. Howe for another visit.  During her visit to Dr. Howe on June 22, 2007 and June 23, 2007 he prescribed the use of Sylvadine for the burn and Naproxin to reduce the swelling in her hand and arm.

**June 26, 2007** – By June 26, 2007 Susan's condition was worsening.  Accordingly, on June 26, 2007 she proceeded to see her own doctor, Dr. Allen Shalit as follows:

> Allan Shalit, M.D., P.A., A.B.I.M
> Wayne Medical Center
> 1777 Hamburg Turnpike
> Wayne, NJ 07470
> Phone: 973-839-3600
> Phone: 973-839-3601
> Fax:    973-839-3456

**June 26, 2007** – At the time of her visit to Dr. Shalit on June 26, 2007 Susan's fingers were numb and tingling and she still had pain and discomfort throughout her left

hand and left arm. There was still black and charring on her left hand which would not wash off and which had been there since the accident occurred on June 21, 2007. Dr. Shalit diagnosed her with third degree burn and nerve damage. He prescribed Lyrica to treat the nerve damage.

**July 1, 2007 – July 15, 2007** – During the first half of July 2007, between on or about July 1, 2007 and on or about July 15, 2007, Susan saw Dr. Shalit a second time and third time. The Lyrica which he had prescribed was not helping Plaintiff's condition. Accordingly, Dr. Shalit referred Susan to a neurologist for treatment.

**July 23, 2007** – On or about July 23, 2007 Susan was treated by a neurologist, Dr. Robert Wagner, for her condition. Dr. Wagner is located at the following address:

> Robert Wagner, MD
> North Jersey Neurological Associates, P.A.
> 220 Hamburg Turnpike, Suite 16
> Wayne, NJ 07470
> Phone: 973-942-4778
> Fax:    973-942-7020

**July 27, 2007** – On or about July 27, 2007 Susan returned to Dr. Wagner for a second visit. On this visit Dr. Wagner tested Susan for nerve damage. He advised Susan at that time, among other things, that her left hand and arm were hypersensitive, and that this hypersensitivity may be permanent. He tested her left arm and compared it to her right arm in order to make this determination. He increased her dosage of Lyrica from the 50 milligrams which Dr. Shalit had prescribed up to 75 milligrams during the day, and, in addition, he prescribed 150 milligrams to be taken at night.

**August 31, 2007** – On or about August 31, 2007 Susan returned for her third visit with Dr. Wagner. She continued to treat with Dr. Wagner on or about August 31, 2007 and thereafter, returning approximately every three months for visits.

September 5, 2007 – On or about September 5, 2007 Susan returned to Dr. Wagner. He increased her dosage of Lyrica at that time. He increased the dosage to 75 milligrams with breakfast and 75 milligrams with lunch (for a total of 150 milligrams during the day), and 75 milligrams with dinner and 150 milligrams before bed (for a total of 225 milligrams at night). Susan continued to treat with Dr. Wagner after September 5, 2007, returning for visits approximately every three months.

April 29, 2008 – Susan saw Dr. Wagner on or about April 29, 2008. At that time Dr. Wagner advised Susan that her condition had plateaued and that her injuries were permanent.

3. See #2 above.

4. See #2 above.

5. See #2 above.

6. See #2 above. Medical authorizations have been supplied.

7. See #2 above. Medical authorizations have been supplied.

8. See #2 above.

9. No preexisting condition existed.

10. Plaintiff Susan Latronica was not employed at the time and is not making a claim for lost wages in this case.

11. See #10 above.

12. See #10 above.

13. To be supplied.

14. To be supplied.

15. See the documents produced herewith.

16.     Plaintiffs were eyewitnesses to the accident.     In addition, Royal Caribbean's cabin seward, safety officer doctor, and nurse are also witnesses in the case. Plaintiffs do not presently have the names of these four individuals.  The cabin seward and the safety officer from Royal Caribbean on the cruise were involved in the disposition of the hair dryer while Plaintiff Susan Latronica was being treated for her injuries and reporting the incident to the crew.   The doctor and nurse treated Plaintiff Susan Latronica on the ship at the time the incident occurred.

17.     See #16 above.  The cabin seward, safety officer, doctor, and nurse, upon information and belief, can be reached through Royal Caribbean.  Their names and addresses are presently unknown to Plaintiffs.

18.     See the photographs produced as part of Plaintiffs' document production herewith.

19.     Plaintiff does not contend that Defendant made any admissions relative to this lawsuit.

20.     Communications were had with Royal Caribbean's cabin seward and safety officer regarding the disposition of the hair dryer.  Communications were had with Royal Caribbean's doctor and nurse regarding what had occurred and treating same.

21.     No such statements have been obtained.

22.     Product Liability Act has been violated.

23.     To be supplied.

24.     No.

### SPECIFIC ANSWERS TO FORM A (2) UNIFORM INTERROGATORIES

1.     See Plaintiffs' answer to interrogatory #2 from Form A Uniform Interrogatories above.  Plaintiffs further state as follows.  Royal Caribbean has since

advised Plaintiffs that the hair dryer was a Jerdon First Class 1400, model #JHD14T

manufactured in China.  See Mike Hernandez's July 7, 2008 letter to Plaintiff's counsel

produced herewith.  Mr. Hernandez is a Senior Adjuster, Guest Claims, in Royal

Caribbean's Risk Management Department, and is named as a witness in this regard.

Another individual involved in this matter from Royal Caribbean's Risk Management

Department who has post incident knowledge of Plaintiffs' claim, including the handling

of claim, is James Sauer (whom Plaintiffs telephoned upon their return to New Jersey

immediately after the cruise).  In addition, Plaintiffs further state that shortly after they

took their cruise on the Explorer, their nephew (and his wife) took the same cruise on the

Explorer and, at that time, their nephew (and his wife) took pictures of the same make

and model of the Jerdon hair dryer which had been installed in the Explorer.  Copies of

the pictures taken by them (whose names are Matthew and Alison Webb and who are

named as a witness herein) are produced herewith.

    2.       See #1 above.

    3..       See #1 above..

    4.       See the documents produced herewith.

    5.       See #1 above.

    6.       See #1 above.

    7.       See #1 above.

    8.       See #1 above.

    9.       See #1 above.

    10.      See #1 above.

    11.      See #1 above.

12.    See #1 above.

13.    No.

14.    See #1 above.

15.    Economic losses have and continue to be suffered.   Out of pocket expenses are set forth above.   Plaintiffs reserve their right to obtain an economic loss report prepared by an expert for use in this case.

16.    See #1 above.

I certify that the foregoing answers to interrogatories are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_Susan Latronica_
Susan Latronica

## CERTIFICATION

Pursuant to Rule 1:4-4(c) it is hereby certified that the certificant set forth above has acknowledged the genuineness of her signature and that the original signature will be supplied if requested by the Court or any party.

Dated: 4/22/09

_Mitchell B. Seidman_
Mitchell B. Seidman, Esq.

# EXHIBIT "B"

07/03/2010  11:28  8738427020                     NORTH JERSEY NEUROLOGIC ASSOC         #0628 P.002

ANN MARIE MASCELUNO, M.D.
ROBERT WAGNER, M.D.
J. ERINA MONOK, M.D.

HAROLD S. LEABER, M.D.
FRANK L. GAZZILLO, JR., M.D.
ELIOT H. CHODOSH, M.D.

NORTH JERSEY NEUROLOGIC ASSOCIATES, P.A.
229 HAMBURG TURNPIKE · SUITE 16
WAYNE, NEW JERSEY 07470
TELEPHONE 973 942-4773 · FAX 973 942-7920
DIPLOMATE OF AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
ELECTROENCEPHALOGRAPHY  ELECTROMYOGRAPHY

## NARRATIVE REPORT

July 6, 2010

RE: SUSAN LATRONICA
DOB: 1/30/1971

I have been following Susan Latronica for symptoms of hypersensitivity, numbness, and neuropathic pain in the left hand since July of 2007. When I initially saw her on July 23, 2007, she stated that she had no symptoms until suffering a burn when using a hair dryer on a cruise ship approximately one month prior to seeing me. She initially stated that she saw sparks fly while holding the hair dryer and then felt a burning in the left hand with tingling and numbness into digits 4 and 5 of the hand and running up the medial side of the left forearm. Initially, she had symptoms that did run up toward her shoulder. She said that, at times, she did notice that, when she leaned on her left elbow after the injury, she did have some hypersensitivity. However, this did not occur prior to the burn. She had no trouble with her legs or right arm at that time and did not have any neck pain, headaches, or head trauma.

Her initial examination, back in July of 2007, did show some weakness in an ulnar distribution with some mild weakness in the first dorsal interosseous as well as in the abductor digiti minimi. She also had hypersensitivity in digits 4 and 5 of the left hand as well as in the medial forearm and medial upper arm. At that point, we increased the dose of Lyrica that she was initially on, and she was also using Darvocet for pain as needed, which we did continue.

She subsequently had an EMG and nerve conduction study in July of 2007, which did not show any clear nerve injury in the distribution of her symptoms. However, this is not uncommon if the smaller fibers of the nerve are involved in an injury, which was suggested by the type of neuropathic pain she was having. The only clear finding on the EMG and nerve conduction study at that time was a decreased left median sensory nerve amplitude and conduction velocity, possibly consistent with mild carpal tunnel syndrome, which was not in the distribution of the symptoms she described with the nerve injury.

She was initially treated with Lyrica for the pain, and this seemed to help at times although, clearly, she had exacerbations of the pain intermittently, particularly when she was in cold environments. She said she did have difficulty grasping things at times secondary to the discomfort, particularly when the pain was worse. She also had some color changes in the hand with some blueing of the fingers, particularly in cold temperatures, which she would notice when going to her son's hockey games.

She was subsequently seen by Dr. Ciocon of Vascular Surgery in November of 2007. She had vascular studies which showed good flow and no clear vascular insufficiency. Please refer to these reports as needed. She also had an MRI of her cervical spine in February of 2008, which showed some minimal degenerative changes without any clear reason for the symptoms she described. She had an MRI of the

07/08/2010  11:30  9739427020                    NORTH JERSEY NEUROLOGIC ASSOC.        #0828 P.003

RE: SUSAN LATRONICA
July 6, 2010
Page two

brachial plexus in January of 2009, which was unremarkable, and an MRI of the head in January of 2009, which was also unremarkable. These studies were performed due to an exacerbation of the pain she described. In January of 2009, she noticed some increased pain in the left hand, but was not having any weakness at that time. She has continued to use Lyrica throughout her course and has noticed some mild weight gain, which could be attributed to the Lyrica. In addition to the color changes, which I did see on at least one occasion when she came in from the cold, there was some mildly decreased temperature in the left hand intermittently as well. Her pulses were always easily palpable. She did have a repeat nerve conduction study in January of 2009, which showed the same left median sensory conduction abnormality, which was slightly improved without any clear nerve injury in an ulnar or lower C8 radicular distribution, which was the distribution of her symptoms. At that point, in January of 2009, I had suggested that she get a second opinion from a physician who specializes in reflex sympathetic dystrophy or complex regional pain syndrome, which I felt was likely the syndrome the patient was suffering from. To my knowledge, at this point, she has not gone for the second opinion, but has continued to have fluctuation of her symptoms over time with exacerbations and then some improvement of her symptoms intermittently. She also noted an irritation of her symptoms in 2010, after a fall on the ice. However, she seems to have returned back to baseline with the symptoms she has at this point.

As of her last visit to my office on June 8, 2010, she continues to have the neuropathic pain and still does get pins-and-needles in digits 4 and 5 of the left hand and tingling into the medial forearm at times. There are no symptoms above the elbow at this point, and she feels her strength is generally good unless the pain is exacerbated and it hurts to perform activities. This still can be triggered by cold temperatures. At this point in time, she remains on Lyrica and still does require either an anti-inflammatory such as Mobic or a narcotic such as Percocet on most nights for the pain.

Her most recent neurologic exam showed hypersensitivity in digits 4 and 5 on sensory testing, but no other abnormalities were seen.

It does appear that the patient is suffering from a nerve injury, possibly in a small-fiber distribution based on the quality of the pain as well as the fact that no obvious abnormalities were found on previous nerve conduction testing. It seems that the timing of the symptoms does correspond to the use of the hair dryer that she describes when on the cruise ship. She has had persistent discomfort and has had to use pain medication throughout the course since July of 2007.

Thank you for your time and consideration.

Robert A. Wagner, M.D.

RAW/sdk

# EXHIBIT "C"

**St. Charles Hospital**

**200 Belle Terre Road**
**Port Jefferson, NY 11777**
**Phone: 631-474-4334**

NEUROLOGICAL CONSULTATION

Date Of Service:  07/07/2014

Mitchell B. Seidman, Esq.,
Seidman & Pincus, LLC
777 Terrace Avenue, Suite 508,
Hasbrouck Heights NJ 07604

Dear Mr. Seidman:

Susan Latronica was seen for evaluation today.  I explained to Ms. Latronica the purpose of today's evaluation including the fact that this evaluation is only for medicolegal purposes and it does not constitute a doctor-patient relationship.  She indicated that she understood. · Historical details were obtained directly from Ms. Latronica as well as review of the following documents:

- Plaintiff's (Susan Latronica's) answer to her interrogatory in the case.
- Report of Robert Wagner, MD dated 07/06/2010.
- Defendant's expert report of Aaron Rabin, MD dated 08/31/2011.
- Medical records of Allan Shalit, MD.
- Medical records of Robert Wagner, MD
- Medical records of Michelle Howe, DO.

In addition, I reviewed a series of color photographs, which you had forwarded to me and also others, which Ms. Latronica brought with her today.  These included photographs of her hand from the day of the original injury; photographs of a hair dryer, and other pictures of Ms. Latronica's left hand, as detailed below.

Ms. Latronica was in her usual state of health in 06/2007 when her husband had surprised her with a cruise for their fifteenth wedding anniversary.  The voyage was between 06/17/2007 to 06/21/2007 from New Jersey to Bermuda.  On the last night of the cruise, Ms. Latronica was drying her hair.  She is right handed and was holding the brush in her right hand and the hairdryer in her left hand.  The hairdryer stopped working.  She thought that she had inadvertently taken her finger off the power switch, so she tried to put it on again.  Then the device shot out a spark and she felt an electrical sensation travel through her left upper extremity.  The hairdryer had burnt her skin and was actually stuck to her hand.

She peeled the hairdryer off her hand and went to the ship's medical facility.  She was given Silvadene burn cream and told to follow up with her regular doctor.  She came home on a Friday and her regular doctor was out of town, so she went to an urgent care center where she was again given Silvadene and the hand was wrapped.

Because the skin felt so sensitive, the next day she went back to the urgent care for another evaluation and then ended up seeing her regular doctor, Allan Shalit, MD on Monday.

The left hand and forearm continued to remain painful and she was prescribed Lyrica with no improvement after several weeks of treatment.  She saw a neurologist, Dr.Wagner, from approximately 07/2007 through sometime in 2010 or 2011.  Eventually, Dr. Wagner stopped the Lyrica and tried other pain medications, none of which were helpful.  At this time, the symptoms have stabilized.

Ms. Latronica states that currently whenever she gets cold, her fingers will turn white or blue.  She brought with her today photographs of this sign, there is one from 12/2013 and one from approximately 02/2014.  They show blue and white discoloration of the left hand.  In addition, during the office visit today, I witnessed a similar discoloration, which she said was secondary to the air conditioning in the room; to a much lesser extent there was also discoloration of the right hand.  Mr. Latronica describes frequent pain in the left upper extremity.  In particular, along the ulnar and volar surface of the hand extending up the forearm, but to some extent involving the entire left upper extremity up to the shoulder.

There has never been any swelling.  Early on, there may have been some weakness, but at this time, there is no apparent weakness, but sometimes she will drop an object because she will have a change in sensation and she is not sure of whether or not she is holding on to it.  The symptoms have never been treated by physical or occupational therapy and although she uses the arm when she has to, she "babies" it as much as possible.

CURRENT MEDICATIONS: Prilosec.

She has no known drug allergies.

Past medical history and review of systems are significant for having low iron and a bleeding duodenal ulcer, possibly related to taking too much Advil.  In 2003, she broke a finger on her right hand in an accident, where it was closed in a car door.  Approximately 17 years ago, she had a bout of postpartum depression treated with Zoloft for one and a half years.  Around 2000, she had pain in her lower back and lower extremities including evaluation for a few days in a hospital.  She was eventually told that it was fibromyalgia and after approximately two years coinciding with weight loss, these symptoms totally resolved.  There is surgical history of tonsillectomy and tubal ligation.

Currently, Ms. Latronica lives in West Milford, New Jersey with her husband and two sons.  She has taught preschool in the past and is currently in the interview process for positions.  She is involved with her son's hockey teams.  While working as a substitute teacher, she did have to miss some days of work because of the left upper extremity symptoms and also had significant discomfort while carrying out her work responsibilities.

According to Dr. Wagner's 07/06/2010 narrative, he began seeing Ms. Latronica in 07/2007, at that time finding some weakness in an ulnar distribution with mild weakness in the first dorsal interosseous and the abductor digiti minimi muscles and also a hypersensitivity in digits four and five of the left hand as well as in the medial forearm and medial upper arm.  At that time, he increased her dose of Lyrica and also continued p.r.n. Darvocet.  EMG and nerve conduction studies in 07/2007 did not show any apparent contributory findings.  However, a decrease in the left median sensory nerve amplitude and conduction velocity was present.  Reportedly vascular studies in 2007 were normal as well as MRIs of the cervical spine, brain and brachial plexus.  The brain and brachial plexus studies, I reviewed myself today.  Dr. Wagner documents that he did see color changes in her hand on at least one occasion and also reported some mildly decreased temperature in the left hand intermittently.  Nerve conduction studies were repeated in 01/2009, which did not reveal any new contributory findings.  As of the time of the 2010 report, her most recent neurologic examination continued to show hypersensitivity in digits four and five on sensory testing, but no other abnormalities.

On examination, Ms. Latronica was awake and alert. She conversed appropriately with clear and fluent speech. Heart beat was regular. There were no cranial bruits. Visual fields were full. Extraocular movements were intact. Pupils were equal, round, and reactive to light. Facial sensation was normal. Soft palate and tongue were midline. Muscle bulk and tone was normal throughout, including in the hands. There was no drift. Motor exam was 5/5 bilaterally including the following; deltoid, elbow flexion, elbow extension, finger extension, finger flexion, first dorsal interosseous, abductor digiti minimi, abductor pollicis brevis, hip flexion, knee flexion, and dorsiflexion. Sensation to light touch was decreased in the left finger tips and left volar and ulnar surfaces distal to the elbow, with sensation to pinprick increased over this distribution. In addition to the decreased sensation to light touch, with light touch and light palpation, there was also at times some discomfort. To my touch, temperature was symmetric between the two hands. At one point, there was a color change more prominent in the left hand than the right hand involving the fingertips turning blue. The blueness was most prominent on digits one and two of the left hand. Vibration sense was normal. Joint proprioception sense was normal. Muscle tone was normal. reflexes were symmetric and within normal range. Finger-nose-finger, fine finger movements, and rapid alternating movements were all normal. Gait was normal based and steady. Tandem gait was normal. Romberg sign was absent.

IMPRESSION AND OPINION:

Ms. Latronica is a 43-year-old right-handed woman who sustained a burn injury from a hairdryer as described above on 06/21/2007. Since that time, she has had persistent sensory abnormalities including pain disproportionate to the original inciting incident, skin color changes and possible temperature asymmetry. There has never been any sweating changes or edema. Weakness may have been present in the past, but is not at this time. Overall her symptoms have been stable for over three years.

Complex regional pain syndrome (CRPS) is a poorly understood and poorly defined entity which may include various signs and symptoms confined to a limb. The most prominent symptom is pain disproportionate to the inciting incident. The chronic nature of CRPS is apparently related to a central process of brain cortical reorganization. Once this cortical reorganization has occurred, the pain becomes persistent and extremely resistant to treatment. This process also may result in symptoms in a pattern atypical for a neurological disease. Research indicates that at least 60% of patients with CRPS continue to have symptoms for many years after pain onset.

To a reasonable degree of medical certainty Ms. Latronica's symptoms are consistent with CRPS and not likely to further improve, and thus constitute a permanent neurological injury.

Sincerely,

David J. Anschel, MD

Director of Clinical Neurophysiology

References

Borchers AT, Gershwin ME. Complex regional pain syndrome: A comprehensive and critical review. *Autoimmunity Reviews* 2014;13:242-265.

Goebel A.  Complex regional pain syndrome in adults.  *Rheumatology* 2011;50:1739-1750.
Konzelmann M, Deriaz O, Luthi F.  Diagnosis of partial complex regional pain syndrome type 1 of the hand: retrospective study of 16 cases and literature review.  *BMC Neurology* 2013;13:28

# EXHIBIT "D"

### St. Charles Hospital

**200 Belle Terre Road
Port Jefferson, NY  11777
Phone: 631-474-4334**

February 6, 2015

Mitchell B. Seidman, Esq.,
Seidman & Pincus, LLC
777 Terrace Avenue, Suite 508,
Hasbrouck Heights NJ 07604

Re: Susan Latronica vs. Royal Caribbean Cruises, Ltd., et al.

Dear Mr. Seidman:

I have prepared the following report as a supplement to my July 7, 2014 Neurological Consultation.  I understand that you would like my opinion as to causation of Ms. Latronica's symptoms of complex regional pain syndrome (CRPS).

CRPS describes a disorder characterized by spontaneous or stimulus-induced limb pain which is disproportionate to the inciting event.  There may be variable amounts of accompanying motor or autonomic symptoms.  The original event, ultimately leading to CRPS may be any type of trauma or damage to nerves – fractures, surgery, and burns are common examples.  In a minority of patients, there is no recollection of a triggering episode.  Symptom onset may be nearly immediate or delayed by a few days to weeks.  Often the symptoms spread from the site of the original injury.  Most commonly still confined to a single limb.  CRPS is almost invariably monophasic, typically with some early improvement followed by stabilization of symptoms.

The cause of CRPS is not completely understood.  In part this has been due to the difficulty researching a syndrome which has not been strictly defined.  Hypothesis include an inflammatory mediated response; sympathetic nervous system dysregulation; central sensitization to pain; persistent peripheral nerve damage; ischemia/reperfusion injury.  It is the present author's opinion that all of these mechanisms may play a role to variable extents in different patients.

The symptoms exhibited by Ms. Latronica are those associated with CRPS, including pain disproportionate to the inciting incident and changes in color of the fingers and palm or her left hand. Ms. Latronica's pain appears to be a continuum from the time of the initial injury persisting until the present. At some point there was the development of autonomic symptoms including hypersensitivity to cold in her left hand. Weakness was present shortly after the injury, but improved some time ago. My own examination confirmed both decreased sensation and allodynia. I also observed a skin color change more prominent in the left hand than the right involving the fingertips turning blue.

There is no pre-existing history of the symptoms exhibited by Ms. Latronica as described herein and in my July 7, 2014 report. These symptoms indicate that she sustained a nerve injury on June 21, 2007, and has developed CRPS as a result of the June 21, 2007 incident, and I find to a reasonable degree of medical certainty that her nerve injury and CRPS were in fact caused by the June 21, 2007 incident based thereon and based on the fact that the symptoms are consistent with a nerve injury and CRPS.

Sincerely,

David J. Anschel, MD

Director of Clinical Neurophysiology
Adjunct Associate Professor of Neurology, New York University School of Medicine

References

Borchers AT, Gershwin ME. Complex regional pain syndrome: A comprehensive and critical review. *Autoimmunity Reviews* 2014;13:242-265.
Goebel A. Complex regional pain syndrome in adults. *Rheumatology* 2011;50:1739-1750.
Konzelmann M, Deriaz O, Luthi F. Diagnosis of partial complex regional pain syndrome type 1 of the hand: retrospective study of 16 cases and literature review. *BMC Neurology* 2013;13:28

# EXHIBIT "E"

# SEIDMAN & PINCUS, LLC

## ATTORNEYS AT LAW

777 TERRACE AVENUE, SUITE 508
HASBROUCK HEIGHTS, NEW JERSEY 07604
(201) 473-0047   FAX: (201) 288-7009

MEMBERS:
MITCHELL B. SEIDMAN*
E-MAIL: ms@seidmanllc.com
ANDREW J. PINCUS*
E-MAIL: ap@seidmanllc.com

OF COUNSEL:
LANI D'AGOSTINO**
E-MAIL: ld@seidmanllc.com
REENA FORST+
E-MAIL: rf@seidmanllc.com
PHYLLIS BARKER°
E-MAIL: pb@seidmanllc.com

ADMISSION:
*MEMBER OF NJ & NY BAR
+MEMBER OF NJ, NY & DC BAR
°MEMBER OF NJ & CA BAR
~MEMBER OF NJ BAR

March 1, 2013

**VIA FAX AND REGULAR MAIL**
U.S. Magistrate Judge Joseph A. Dickson
United States District Court
District Court of New Jersey
MLK Jr. Federal Building & Courthouse
50 Walnut Street, 4th Fl.
Newark, NJ 07102

Re:   Susan Latronica *et al.* vs. Royal Caribbean Cruises, Ltd. *et al.*
       Civil Action No. 2:09-cv-06148-PGS-ES

Dear Magistrate Judge Dickson:

We represent the Plaintiffs in this products liability case. Your Honor will recall that this is the case where the Plaintiff Susan Latronica was electrocuted by a hair dryer while on a cruise with Royal Caribbean Cruises, Ltd. ("Royal Caribbean") on June 21, 2007. After being electrocuted by the hair dryer Plaintiffs brought this products liability case against the manufacturer of the hair dryer (Oriental Universe – who has defaulted in this case), the distributor of the hair dryer (Jerdon Products, LLC – "Jerdon"), and the retailer of the hair dryer (the retailer being Royal Caribbean in the sense that Royal Caribbean is the party which made the hair dryer available for use to the public).

As of the last status conference with Your Honor the Plaintiffs, Royal Caribbean, and Jerdon were contemplating a possible resolution whereby (i) Jerdon would make a payment to Plaintiffs, (ii) a plenary hearing (without a jury) would take place before the District Judge between Plaintiffs and Royal Caribbean strictly on the damages suffered by Plaintiffs as a result of this occurrence (not on duty, breach, nor causation – only damages), and (iii) with Plaintiffs and Royal Caribbean agreeing to abide by whatever the District Judge found the appropriate amount of damages to be. The contemplated resolution then being discussed also involved Jerdon and Royal Caribbean retaining their indemnity rights against one another to be addressed in a manner they saw fit at a later date.

We are pleased to advise Your Honor that the contemplated resolution as summarized in the preceding paragraph has come to fruition in a stipulation and proposed order executed by all counsel of record in this case. We enclose the original plus one copy of this stipulation and proposed order herewith. If the enclosed stipulation and proposed order meets with Your Honor's approval then we ask that same be entered and

S:\Latronica, Susan\Ltr to Judge Dickson 3-1-13.docx

# SEIDMAN & PINCUS, LLC

Magistrate Judge Dickson
March 1, 2013.
Page 2

a conformed copy be posted on ECF/PACER.  We also ask that a conference call be set up to coordinate the scheduling of the contemplated plenary hearing with the District Judge.  In this regard, we advise that we do not believe the plenary hearing will be more than one day (it will likely be less than a day), but the District Judge's schedule nonetheless needs to be coordinated with the Plaintiffs and doctors who are expected to testify at the subject hearing.

We look forward to hearing from Your Honor concerning the foregoing matter at Your Honor's earliest convenience.  Thank you.

Respectfully yours,

Mitchell B. Seidman

MBS/tf
Enclosure
cc:    Gordon Arnott, Esq. (via email and reg. mail)
       Kyle Everly, Esq. (via email and reg. mail)

S:\Latronica, Susan\Ltr to Judge Dickson 3-1-13.docx

HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street
26th Floor
New York, New York 10281

*Attorneys for Royal Caribbean*
*Cruises, LTD and Royal Caribbean International*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------------x

SUSAN LATRONICA and MICHAEL LATRONICA

                                            Plaintiffs,

            vs.

ROYAL CARIBBEAN CRUISES LTD.,
ROYAL CARIBBEAN INTERNATIONAL,
JERDON PRODUCTS, LLC, ELEC-TECH
INTERNATIONAL CO. LTD, JOHN DOE
DEFENDANT #4, JOHN DOE DEFENDANT #5,
and JOHN DOE DEFENDANTS #6 thorough #15,

                                            Defendants.

---------------------------------------------------------------x

Civil Action No.
2:09-cv-06148-PGS-ES

**STIPULATION**
**PROPOSED ORDER**

        **WHEREAS** Susan Latronica and Michael Latronica have settled/compromised their
claims against Jerdon Products, LLC for twenty-three thousand dollars ($23,000); and,

        **WHEREAS** no other Captioned party save Royal Caribbean Cruises Ltd. (sued herein as
Royal Caribbean Cruises Ltd, Royal Caribbean International, hereinafter "RCCL") has appeared
in this action;

        **IT IS HEREBY STIPULATED** by and between the undersigned counsel for Susan
Latronica, Michael Latronica, and RCCL, that all issues between them have been resolved, with
the exception of which of Susan Latronica's ailments or medical conditions are related to the
incident aboard the vessel and the quantification of Plaintiffs' injuries/damages.

        **IT IS FURTHER STIPULATED**, that the above outstanding issues shall be determined
by a trial or plenary hearing before a United States District Judge, without a jury, in the format
directed by the District Judge.

{NY135864.3 }

IT IS FURTHER STIPULATED that the damages determined by the District Judge minus ($23,000) which is the amount of the settlement between Susan Latronica, Michael Latronica and Jerdon Products LLC, shall be the judgment of the Court in favor of Plaintiffs.

IT IS FURTHER STIPULATED the judgment shall be paid by or on behalf of Royal Caribbean Cruises Ltd. within the later of 30 days after entry of judgment or 30 days after all appeals by any non-settling party, which shall be limited to the trial issues, are resolved by the respective Court.

IT IS AGREED that payment of, funding of, or payment of any part of the settlement or judgment is not an admission of guilt or fault on the part of any party but is funded or paid only as a settlement or satisfaction of the judgment.

IT IS FURTHER STIPULATED by and between Royal Caribbean Cruises Ltd. and Jerdon Products, LLC that responsibility for the judgment or payment of the settlement or judgment by Royal Caribbean Cruises Ltd. and Jerdon Products, LLC does not extinguish any indemnity claims each may have as against the other.

| | |
|---|---|
| _____  3/1/13 | _____  2/13/13 |
| Mitchell B. Seidman, Esq.      Dated | Kyle G. Everly, Esquire      Dated |
| Seidman & Pincus, LLC | Segal McCambridge Singer & Mahoney, Ltd. |
| 777 Terrace Avenue, Suite 508 | 1818 Market Street, Suite 2600 |
| Hasbrouck Heights, NJ 07604 | Philadelphia, PA 19103 |
| Phone: 201-473-0047 | Phone: 215-972-8015 |
| Fax:    201-288-7009 | Fax:    215-972-8016 |
| *Attorneys for Plaintiffs* | *Attorneys for Jerdon Products, LLC* |

_____  2/13/13
Gordon S. Arnott, Esq.      (sqs)   Dated
Hill, Betts & Nash, LLP
One World Financial Center
200 Liberty Street
New York, NY 10281
Phone: 212-839-7000
Fax:    212-466-0514
*Attorneys for Royal Caribbean Cruises, Ltd.,
and Royal Caribbean International*


SO ORDERED

_____
JOSEPH DICKSON, U.S.M.J.


[NY1358643]

# EXHIBIT "F"

Terry Fitzhugh

| | |
|---|---|
| From: | Mitch Seidman [ms@seidmanllc.com] |
| Sent: | Wednesday, December 05, 2012 2:03 PM |
| To: | Terry Fitzhugh |
| Subject: | FW: Iatronica  v. RCCL |
| Attachments: | Stipulation Proposed Order (NY136752).PDF |

Print email and attachment and put in my in box.

Mitchell B. Seidman, Esq.
Seidman & Pincus, LLC
777 Terrace Avenue, Suite 508
Hasbrouck Heights, NJ 07604
Phone: 201-473-0047, ext. 11
Fax:    201-288-7009
Email:  ms@seidmanllc.com

From: Gordon S. Arnott [mailto:garnott@hillbetts.com]
Sent: Tuesday, December 04, 2012 1:35 PM
To: Mitch Seidman
Subject: Iatronica v. RCCL

Mitch

I was out of the office and just received your voicemail.

I think the attached was the last stipulation version.

You mentioned a cap rather than a potential appeal on damages.
What number could you accept as a cap?  I can then check if that satisfies the concerns.

Regards
Gordon S. Arnott
HILL, BETTS & NASH LLP.
One World Financial Center
200 Liberty Street
New York, NY 10281
Tel. No.:  (212) 589-7515
Fax No.:  (212) 466-0514

The information in this Internet e-mail is confidential, may be legally privileged and is intended solely for the addressee.  If the reader of this communication is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this communication in error and that any use, review, dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete this e-mail and any copy thereof.

1

HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street
26th Floor
New York, New York 10281
Attorneys for Royal Caribbean
Cruises, LTD and Royal Caribbean International

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------------x
SUSAN LATRONICA and MICHAEL LATRONICA

                                   Plaintiffs,

               vs.

ROYAL CARIBBEAN CRUISES LTD.,
ROYAL CARIBBEAN INTERNATIONAL,
JERDON PRODUCTS, LLC, ELEC-TECH
INTERNATIONAL CO. LTD, JOHN DOE
DEFENDANT #4, JOHN DOE DEFENDANT #5,
and JOHN DOE DEFENDANTS #6 thorough #15,

                                 Defendants.

-----------------------------------------------------------------x

Civil Action No.
2:09-cv-06148-PGS-ES

**STIPULATION**
**PROPOSED ORDER**

*$ twenty three/oo*

    **WHEREAS** Susan Latronica and Michael Latronica have settled/compromised their claims against Jerdon Products, LLC for ~~NUMBER~~ dollars ( $23,000); and,

    **WHEREAS** no other Captioned party save Royal Caribbean Cruises Ltd. (Sued herein as Royal Caribbean Cruises Ltd, Royal Caribbean International, hereinafter "RCCL") has appeared in this action;

    **IT IS HEREBY STIPULATED** by and between the undersigned counsel for Susan Latronica, Michael Latronica, and RCCL, that all issues between them, including causation as to the alleged incident causing injuries but not as to causation for all of Susan Latronica's ailments or medical conditions which causation is saved for trial, have been resolved with the exception of the quantification of Plaintiffs' injuries/damages.

    **IT IS FURTHER STIPULATED**, that the issue of the quantification of Plaintiffs' injuries/damages shall be determined by a trial or hearing before a United States District Judge, without a jury, in the format directed by the District Judge.

INY1358641.1

*jbc*

IT IS FURTHER STIPULATED that the damages determined by the District Judge minus ($23,000) which is the amount of the settlement between Susan Latronica, Michael Latronica and Jerdon Products LLC, shall the judgment of the Court in favor of Plaintiffs.

IT IS FURTHER STIPULATED the judgment shall be paid by or on behalf of Royal Caribbean Cruises Ltd. within the later of 30 days after entry of judgment or 30 days after all appeals, which shall be limited to damage causation and damages, are resolved by the respective Court.

IT IS AGREED that payment of, funding of, or payment of any part of the settlement or judgment is not an admission of guilt or fault on the part of any party but is funded or paid only as a settlement or satisfaction of the judgment.

IT IS FURTHER STIPULATED by and between Royal Caribbean Cruises Ltd. and Jerdon Products, LLC that responsibility for the judgment or payment of the settlement or judgment by Royal Caribbean Cruises Ltd. and Jerdon Products, LLC does not extinguish any indemnity claims each may have as against the other.

| | |
|---|---|
| Mitchell B. Seidman, Esq.     Dated | Kyle G. Everly, Esquire     Dated |
| Seidman & Pincus, LLC | Segal McCambridge Singer & Mahoney, Ltd. |
| 777 Terrace Avenue, Suite 508 | 1818 Market Street, Suite 2600 |
| Hasbrouck Heights, NJ 07604 | Philadelphia, PA 19103 |
| Phone: 201-473-0047 | Phone: 215-972-8015 |
| Fax:    201-288-7009 | Fax:    215-972-8016 |
| *Attorneys for Plaintiffs* | *Attorneys for Jerdon Products, LLC* |

Gordon S. Arnott, Esq.     Dated
Hill, Betts & Nash, LLP
One World Financial Center
200 Liberty Street
New York, NY 10281
Phone: 212-839-7000
Fax:    212-466-0514
*Attorneys for Royal Caribbean Cruises, Ltd.,*
*and Royal Caribbean International*

SO ORDERED

_____
JOSEPH DICKSON, U.S.M.J.

{NY135564.1}

# EXHIBIT "G"

Susan
LoHonica

12/2/12

→(212) 589-7515

The 1st order 11/20/12 — He will ask his
people what:

① Taking out cessation language & just
leaving his light to prove pre-existing
implies, which is his real concern

② what the hard cap on damages would
be to ask an appeal

③ A term of the stip that says no
appeal on damages unless its above
a particular amt

# EXHIBIT "H"

DRS RABIN FREMED PRINCE P C
700 EAST PALISADE AVENUE
ENGLEWOOD CLIFFS NEW JERSEY 07632
TELEPHONE (201) 568 3412
FAX (201) 568 6249
WWW RFPNEUROLOGY COM

AARON RABIN M D  PH D  FAAN FACP
ERIC L FREMED M D
DAVID M PRINCE M D
DIPLOMATES IN NEUROLOGY
AMERICAN BOARD OF
PSYCHIATRY AND NEUROLOGY

DAVID M MASUR PH D  A B P P
DIPLOMATE IN CLINICAL NEUROPSYCHOLOGY
AMERICAN BOARD OF
PROFESSIONAL PSYCHOLOGY

KEITH R BENOFF PH D
CLINICAL NEUROPSYCHOLOGY

MIDDLESEX COUNTY OFFICE
EAST BRUNSWICK NEW JERSEY 08816

MORRIS COUNTY OFFICE
PARSIPPANY NEW JERSEY 07054

PLEASE ADDRESS ALL CORRESPONDENCE TO
BERGEN COUNTY OFFICE
ENGLEWOOD CLIFFS NEW JERSEY

August 31, 2011

Deirdre M  Dennis, Esq
Law Offices of
Jonathan R  Westpy
50 Millstone Road
Building 300, Suite 140
East Windsor, NJ 08520

RE  Latronica, Susan
OUR FILE #  59437
Westpy File #  YRVL63030
(Latronica v  Focus Products)
Hartford Ins  Co
c/o Antanik Thomson, Adj
Hartford Claim #  YRVL63030
D/A  06/21/07

Dear Ms  Dennis

I evaluated Mrs  Susan Latronica on 08/31/11   She was aware that the
evaluation was being performed at you request and that no doctor-
patient relationship was being established

Mrs  Latronica was a 40-year-old woman who complained of symptoms, in
and around, her left arm and left hand

On 06/21/07, while on a cruise and using a hair dryer that she held in
her left hand, after pushing the switch of the hair dryer, she noted a
spark from the region of the handle that she was holding, after which
she experienced a sensation of an electric current going up her left
arm and that the hair dryer was stuck to the palm of her left hand
Immediately, she grabbed the hair dryer with her right hand and threw
the hair dryer, with her right hand, on the floor   Subsequently, she
noted a "black-burn" over the region of the left hypothenar eminence
of her left hand, that she pointed to, that was accompanied by very

small, but noticeable black-type lines that radiated distally along
the whole of the volar surface of her left little finger and
proximally along the hypothenar eminence, to the level just proximal
to her left wrist   She went to the cruise ship infirmary, at which
time she complained that the site of the burn was painful and that the
whole of her left arm "felt tired "   She was evaluated, the region of
her wound was dressed with Silvadene and the site was bandaged   When
she returned from her cruise, on 06/22/11, she saw a Dr ·Howe, at the
Valley Health Walk-In Clinic   Her wound was cleansed, re-dressed with
Silvadene and re-bandaged   She was told to take Advil or Tylenol for
pain   She returned to the walk-in clinic, on 06/23/11, at which time
she was told to go to her primary care physician   She was seen and
followed-up by her primary care physician, Dr Shalit, who re-
evaluated the region of her reported injury, cleansed it, dressed it
with Silvadene, and re-bandaged the site   She was given a
prescription for anti-inflammatory medication   While seeing Dr
Shalit, Mrs Latronica recalled that the whole of her left arm was
numb, that she characterized as consisting of recurrent and persistent
pins-needles-feelings accompanied by sensations of heaviness   She was
referred to and saw, a neurologist, Dr Wagner, who in time evaluated
her with a nerve-type test, sent her for MR scans, and prescribed
medications that, for a time, included Lyrica   She takes no
medication at the present time   She recalled no other treatment

Despite treatment and the passage of time, Mrs Latronica has
continued to have symptoms   She complained of occasional-intermittent
sensations of "achiness" throughout the whole of her left arm, that
typically, and essentially only, occur with changes in the weather,
such as at the present time "when the nights are cooler," she noted no
other associated neurologic symptoms   She has noted that the volar
surface of her left palm, as well as the volar surfaces of all of the
fingers of her left hand, occasionally turn blue, and then only during
colder weather   She noted no such color changes over the dorsum of
her left hand or her fingers·   She noted no associated neurologic
symptoms   At times, and in a spontaneous fashion, when she is holding
onto things with her left hand, as a consequence of "losing feeling"
throughout the whole of her left palm and all of the fingers of her
left hand, she "drops what she is holding "   She was specific that the
problem is a consequence of a "loss of feeling" but not because of a
loss of strength or loss of power   Also, as a consequence of being
"uncomfortable," she is unable to lie on her left side, specifically
her left arm   She noted no associated neurologic symptoms   She
denied having other neurologic problems   She has no sexual
dysfunction   She has no bladder or bowel dysfunction

She denied being involved in other accidents or having suffered other
injuries

DRS RABIN FREMED PRINCE P C                    Latronica, Susan
                                               August 31, 2011
                                               Page 3

Prior to the incident that occurred on 06/21/07, Mrs Latronica had completed working as a teacher in pre-school   At the time of the incident of 06/21/07, she was not working   Beginning in approximately 09/09, and continuing to the present time, Mrs Latronica has been working, "off-and-on," as a substitute teacher   She works as needed, this varies from 30 hours to zero hours a week, depending on when and how she is called, and what the school system requires at any given time   She is married and is the parent of two sons, ages 14 and 11   She is independent with respect to her activities of daily living   She has continued to drive   She shops, cooks and cleans   During the summer, she "spends time down at the New Jersey shore "   She travels to transport her children in order for them to play "tournament hockey "   She has taken no other extended trips   She does not smoke   She does not drink alcohol

She has no history of medical diseases

She takes no medications

At age 16, she had a tonsillectomy   Several years ago, she had a tubal ligation   She has had no other surgery

After the birth of her first son, i e , her 14-year-old, for a period of approximately two years, she was seen and followed-up for postpartum depression including the taking of psychotropic medication, sertraline (Zoloft), that she recalled taking for approximately 1½ years   She noted no other psychiatric-psychologic counseling or treatment

**PHYSICAL EXAMINATION:**

Mrs Latronica is right-handed   She was 5 feet 1 inch tall and weighed 147 pounds   She came to the examination on time and she was dressed-groomed neatly   She was alert, attentive and oriented   Her language was fluent and coherent   Her answers to questions were appropriate, full and relevant   Her answers to questions resulted in the history documented above   Her mood and affect were normal

When I introduced myself to Mrs Latronica in the waiting room, she was observed to be reading a magazine that she was holding-manipulating in both of her hands   When called, she handed the magazine to her right hand, after which she adjusted her belongings, at which time she stood up in a quick, fluid and facile fashion, unaccompanied by a need to push off, support herself or rock forward, all of which she accomplished without outward manifestations of hesitation or discomfort   She walked into the consultation room, sat and stood, with facility and ease   As she walked into the

DRS RABIN FREMED PRINCE P C                    Latronica, Susan
                                               August 31, 2011
                                               Page 4

consultation room and while seated, she tended to keep her left hand
in a dystonic posture, flexed at the elbow and mildly flexed at the
wrist, all of which was held in a rigid fashion   However, when
distracted, and more specifically, when she proceeded to attempt to
retrieve some paperwork from her purse that was on the floor to her
left, she was observed to immediately relax the whole of her left
upper extremity, including, the whole of her left arm, forearm, and
hand, all as she rummaged through her purse with both of her upper
extremities, all unaccompanied by outward manifestations of hesitation
or discomfort     On walking from the consultation room to the
examination room, her left upper extremity immediately resumed its
dystonic flexed posture at the elbow and mildly flexion at the wrist,
all as her left upper extremity was held rigidly in front of her, all
of which was no longer apparent when distracted, such as when I
described a need for her to get into her examination gown to which she
consented

Her cranial nerves (II-XII) were normal   Her gait was normal,
including heel, toe and tandem walking, the latter which she was also
able to perform in a reverse fashion   Of note, when her gait was
formally tested, the previously observed dystonic posturing of her
left upper extremity, was no longer apparent, her left upper extremity
was completely relaxed, and she demonstrated spontaneous movements
that were symmetrical and consistent with those that were noted on the
right   Romberg's's sign was negative.  Coordination was normal   She
was mildly neuromuscularly deconditioned with respect to her torso-
flank/core muscles   No focal muscle atrophy was observed   She was
able to get into and out of a partial squatting-crouching position,
unaccompanied by outward manifestations of hesitation, discomfort,
wavering or postural instability   She stepped on and off of a step
stool, leading with one or the other of her lower extremities, with
facility and fluidity, no outward manifestations of hesitation,
discomfort, wavering or postural instability was observed   No drift
was noted   No focal weakness was found   Deep tendon reflexes were
1+/5 bilaterally   All deep tendon reflexes were symmetrical-normal
Plantar reflexes were flexor bilaterally

Sensation to vibration was normal-symmetrical, including with respect
to her left upper extremity, about which she made no mention of
experiencing any discomfort or abnormal sensations   Sensation to pin
was diminished in a global glove-like distribution throughout the
whole of the left hand, including all of the fingers of her left hand
and both the dorsum and volar surfaces of these regions, also,
sensation to pin was diminished over the left forearm, essentially in
a global distribution over the whole of the left volar surface, but
only of the distal region of the dorsum of the left forearm extending
upwards from the wrist for a distance of 5-6 cm, at which point she
stated that sensation was about normal-symmetrical as compared to the

DRS RABIN FREMED PRINCE P C

Latronica, Susan
August 31, 2011
Page 5

right    Two-point discrimination over the volar tips of all of the
fingers of both hands was normal    No other sensory abnormalities were
noted

Her neck was supple and had full range of motion    Adson's maneuver
was negative    Straight leg raising produced no symptoms    Flexion,
lateral flexion and hyperextension of the back were performed
normally    No paraspinal muscle spasm was noted    Motion of her
shoulders and scapulohumeral rhythm were normal and symmetrical

Percussion over any site of her left forearm to the level of her left
elbow resulted in Ms  Latronica's describing a triggering, or an
aggravation, of sensations of an abnormal feeling, consisting mostly
of sensations pins-needles and/or associated tingling, all of which
radiated both proximally and distally, upwards towards the left
shoulder and downwards into the fingers of the left hand, it really
made no difference where the point of percussion was placed and even
only the lightest percussion resulted in triggering or aggravating the
symptoms noted    Similar percussion on the right elicited no symptoms

She had a tattoo over the dorsum of her right foot and the dorsum of
one of the toes of her right foot    She had a tattoo on the inner
aspect of her ankle    She was also wearing an anklet

To palpation, including with respect to her fingers, the palms of each
of her hands, her wrists and her forearms, much of which I performed
while she was distracted, such as when pulses were evaluated, or when
I was manipulating her upper extremities during other parts of the
evaluation, she made no mention of feeling any abnormality or
discomfort, she demonstrated no outward manifestations of hesitation
or discomfort    To touch, no asymmetries of temperature were
appreciated

No trophic changes were seen

The bottoms of her footwear were worn in a symmetrical fashion

**REVIEW OF MEDICAL RECORDS:**

An accident report, signed on 06/21/07, referred to Mrs  Latronica's
having experienced an event that day when she had an incident with
respect to sparking, and the burning of her left hand, from a hair
dryer

(I did not have he benefit of records from Dr  Howe, the Valley Health
Walk-In Clinic, or Dr  Shalit for review )

DRS RABIN FREMED PRINCE P C

Latronica, Susan
August 31, 2011
Page 6

An electrodiagnostic evaluation, dated 07/27/07, referred to Ms Latronica's being evaluated neurologically by Dr R A Wagner, of Neurologic Associates, Wayne, New Jersey, (no formal report of a clinical evaluation was forwarded for review ) The electrodiagnostic evaluation was performed with respect to the cervical region and her upper extremities Other than for an incidental finding of a borderline result for the peak latency of the left median sensory nerve evoked action potential in the left index finger, no other nerve conduction velocity abnormalities and no electromyographic abnormalities were noted, the results were to have been correlated clinically No mention was made of Ms Latronica's having any difficulty in undergoing-tolerating the electrodiagnostic evaluation

In a letter dated 11/01/07, Dr R A Wagner, of North Jersey Neurologic Associates, P A Wayne, New Jersey, referred to initially evaluating Mrs Latronica on 10/29/07 Though she was initially said to demonstrate "some blue coloring" of her left hand, following palpation of her pulses, about which no abnormalities were noted, when her "hand warmed up from the outside, it did return to normal color " Other than for possible borderline weakness (5-/5), of digits 4 and 5 of her left hand, no objective clinical findings of neurologic abnormality were noted, including "sensory" examination In a report of 07/06/10, Dr Wagner reviewed care provided to Mrs Latronica, throughout no objective clinical findings of neurologic abnormality were noted Dr Wagner specifically noted that Mrs Latronica's symptoms did not follow any specific etiologic distribution When seen on 06/08/10, Ms Latronica described that "she feels her strength is generally good unless the pain is exacerbated " No objective clinical findings of neurologic abnormality were noted

Ms Latronica was evaluated by a thoracic cardiovascular surgeon, Dr H L Ciocon, of North Jersey Thoracic and Cardiovascular Surgical Offices, P A , Clifton, New Jersey When seen on 11/13/07, no objective clinical findings of abnormality were noted A vascular evaluation, performed on 11/21/07, showed no sonographic abnormalities with respect to the left upper extremity Other than for reportedly experiencing subjective feelings of abnormal sensation in regions of her left upper extremity, including after holding ice for one minute, no objective findings were noted With respect to the latter, even after holding ice, the examiner made no mention of identifying any trophic changes, and specifically no mention was made of a color change

Enclosed for review were Mrs Latronica's Answers to Interrogatories, accompanied by miscellaneous records-documents

DRS RABIN FREMED PRINCE P C                    Latronica, Susan
                                               August 31, 2011
                                               Page 7

**REVIEW OF IMAGING STUDIES**

An MR scan performed on 01/15/09, was noted on the file to be that of
a chest while the films themselves, appeared to be primarily that of a
shoulder  If these films need formal review, consideration should be
given to referring the images for formal orthopedic or radiologic
evaluation, as needed clinically

An MR scan of the brain, performed on 01/29/09, showed no
abnormalities

**IMPRESSION:**

Today's neurologic evaluation revealed no objective clinical findings
of abnormality

With respect to the incident that occurred on 06/21/07, Ms Latronica
probably experienced elements of superficial and/or cutaneous injury
of soft tissues, that typically heal, wane and resolve, to a
reasonable degree of medical probability, these problems do not result
in permanent neurologic injuries or abnormalities     Serial
evaluations, beginning at the time of the initial incident and
thereafter, including today, demonstrated no objective clinical
findings of neurologic abnormality, including no tropic changes   The
electrodiagnostic study, as reported above, showed an incidental
borderline abnormal finding including the left median nerve, but
showed no electrodiagnostic abnormalities of significance   Of note,
no mention was made of Ms Latronica's having any difficulty in
tolerating examination, including the electrodiagnostic and vascular
studies

Also, her clinical symptoms, and her findings, were not demonstrable
for small fiber neuropathy, that to a reasonable degree of medical
probability, would be a highly improbable development given the nature
of Mrs Latronica's incident and her serial clinical findings

Examination today revealed no objective clinical findings of
neurologic abnormality indicative of central, radicular or peripheral
nervous system dysfunction   Also, some of her responses today were
inconsistent with those noted by other examiners and that she was
described as having an "intact" sensorium   Furthermore, some of her
responses today were in a non-neuroanatomic/non-neurophysiologic
distribution, especially when distracted, when she was observed to use
her left upper extremity, including the whole of her left forearm,
left wrist and left hand, in various activities, as described

After the incident of 06/21/07, Ms Latronica began working as a
substitute teacher, teaching when needed or called, working from 30 to

DRS RABIN FREMED PRINCE P C                     Latronica, Susan
                                                August 31, 2011
                                                Page 8

zero hours a week   She is independent with respect to her activities
of daily living   She has continued to drive, including transporting
her children to tournament hockey games   She shops, cooks and cleans
She travels to the New Jersey shore

With respect to the incident of 06/21/07, from a review of the medical
records noted above, from the history obtained today and from today's
neurologic examination, to a reasonable degree of medical probability,
I find no indication of Mrs  Latronica's having suffered permanent
neurologic injuries, including no findings of her having complex
regional pain syndrome, neither type I nor type II

If there are any records with respect to other evaluations by Dr
Howe, Dr  Shalit or to her being evaluated contemporaneously to at the
Valley Health Walk-In Clinic, please forward these records of review

If there is a need to review other medical records, reports, or
documents, please let me know

I affirm that the information contained within this document was
prepared by and is the work product of the undersigned, and is true to
the best of my knowledge and information

Thank you for having referred Mrs  Susan Latronica for neurologic
examination

                        Yours truly,

                        Aaron Rabin, M D , Ph D , FAAN, FACP

AR/aa

# EXHIBIT "I"

DRS. RABIN, FREMED, PRINCE, P.C.
700 EAST PALISADE AVENUE
ENGLEWOOD CLIFFS, NEW JERSEY 07632
TELEPHONE (201) 568-3412
FAX (201) 568-9249
WWW.RFPNEUROLOGY.COM

AARON RABIN, M.D., PH.D., FAAN, FACP
ERIC L. FREMED, M.D.
DAVID M. PRINCE, M.D.
DIPLOMATES IN NEUROLOGY
AMERICAN BOARD OF
PSYCHIATRY AND NEUROLOGY

DAVID M. MASUR, PH.D., A.B.P.P.
DIPLOMATE IN CLINICAL NEUROPSYCHOLOGY
AMERICAN BOARD OF
PROFESSIONAL PSYCHOLOGY

KEITH R. BENOFF, PH.D.
CLINICAL NEUROPSYCHOLOGY

MIDDLESEX COUNTY OFFICE
EAST BRUNSWICK, NEW JERSEY 08816

MORRIS COUNTY OFFICE
PARSIPPANY, NEW JERSEY 07054

PLEASE ADDRESS ALL CORRESPONDENCE TO
BERGEN COUNTY OFFICE
ENGLEWOOD CLIFFS, NEW JERSEY

February 20, 2014

Gordon S. Arnott, Esq.
Hill, Betts & Nash, LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, NY 10281-1003

RE: Latronica, Susan
OUR FILE #: 99437
HB&N FILE #: 6.0082
(Latronica    v.    Caribbean    Cruises
Hartford Ins. (East Hanover, NJ)
Hartford Claim #: YRVL63030
D/A: 06/21/07

Dear Mr. Arnott:

I evaluated Mrs. Susan Latronica on 02/20/14.  She was aware that the
evaluation was being performed at your request and that no doctor-
patient relationship was being established.

Mrs. Latronica was a 43-year-old woman complained of symptoms in, and
around, her left hand.

Reference is made to my previously having evaluated Mrs. Latronica,
all as noted in my letter of 08/31/11.

Since the evaluation of 08/31/11, Mrs. Latronica has had no interval
medical evaluations or treatment.

Despite the passage of additional time, Mrs. Latronica has continued
to have symptoms.  Most prominently, she complained that the tips of
the fingers of her left hand, most saliently, the tips of left index,
middle, ring and little fingers, turned blue in an intermittent
fashion, all of which typically occurs when the weather turns colder

DRS. RABIN, FREMED, PRINCE, P.C.

Latronica, Susan
February 20, 2014
Page 2

or in a cold environment such as when she accompanies her sons to a hockey rink.  She has similar color changes over the volar tip of her left thumb, but this occurs much less commonly. Afterward, at times, as time progresses, the whole of all of her fingers, also turn blue. After additional time passes, and as the fingers of her left hand "pink-up", her left hand begins to "ache … hurt."  She described no other associated neurologic symptoms.  She described no other neurologic problems or issues.  She has no other neurologic complaints.  She has no sexual dysfunction.  She has bladder-bowel dysfunction.

Since she was last seen, she has not been involved in other accidents and has not suffered other injuries.

In 09/13, Mrs. Latronica began full-time work as a pre-school teacher of predominantly 3-year-old children; at work, she fulfills all of the tasks demanded of her.  She is married and is the parent of two sons, ages: 16 and 14.  She is independent with respect to activities of daily living.  She shops.  She cooks, and she cleans.  She has continued to socialize, manifested "mostly" by accompanying her sons to their hockey games and activities.  She has not traveled.  She does not smoke.  She drinks alcohol but essentially only socially when she goes out."

She has no history of medical diseases.

Other for occasionally taking a tablet of Advil or Tylenol for an occasional headache, unrelated to the above, since she was last seen, Mrs. Latronica has taken no medications and, specifically, she made no mention of taking any medications for her reported symptoms.

She has had no surgery.

She has had no psychiatric evaluation, counseling, or other treatment.

**PHYSICAL EXAMINATION:**

Mrs. Latronica is right-handed. She was 5 feet 1/2 inch tall and weighed 135 pounds. She came to examination on time and she was dressed-groomed neatly.  She was alert, attentive, and oriented.  Her language was fluent and coherent.  Her answers to questions resulted in the history documented above.  Her mood and affect were normal.

When I introduced myself to Mrs. Latronica in the waiting room, she stood up from the seated position in a chair, with her left hand held in almost a limp-flail fashion at her left side, all as she retrieved her belongings with her right hand, after which she walked to the corridors of the office in a fluid and facile fashion.  Throughout the

DRS. RABIN, FREMED, PRINCE, P.C.

Latronica, Susan
February 20, 2014
Page 3

interview, her left upper extremity and predominantly her left forearm, left hand, and the fingers of her left hand were held in a dystonic almost limp-flail like fashion. Otherwise, she seemed to sit comfortably; she demonstrated no fidgeting and no frequent changes in position. She walked through the corridors of the office and into the examination with facility.

When I entered the examination room, Mrs. Latronica was seated on the examination table reading magazine, which she was observed to handle and manipulate symmetrically, including flipping a page or two with one or the other of her upper extremities, including the whole use of her left forearm, wrist, hand, and the fingers of a left hand; no outward manifestations of hesitation or discomfort were observed.

Her cranial nerves (II-XII) were normal. Her gait was normal, including heel, toe and tandem walking, the latter, which she performed in both a forward and in a reverse fashion. When distracted and, specifically, with respect to spontaneous movements and gesturing, including when her gait was tested, no abnormal posturing or flail-type weakness was noted with respect to her left upper extremity and, specifically, with respect to her left forearm and hand. Romberg's sign was negative. Coordination was normal. She was neuromuscularly deconditioned with respect to her torso-flanks/core muscles. No focal muscle atrophy was noted. She was able to get into and out of a partial squatting-crouching position in a fluid and facile fashion, unaccompanied by outward manifestations of hesitation, discomfort, wavering, or postural instability. She stepped on and off of a step-stool, leading with one or the other of her lower extremities, all of which she accomplished with facility; no outward manifestations of hesitation, discomfort, wavering, or postural instability was noted. No drift was observed. No focal weakness was found. Deep tendon reflexes were 1+, all deep tendon reflexes were symmetrical-normal. Plantar reflexes were flexor bilaterally.

Sensation to vibration was diminished in a global-glove-like fashion throughout the whole of her left hand, but most prominently over the volar tips of the fingers of her hand, except for the left thumb. Other than describing diminution of sensation to pin along the medial region of her left arm, forearm and hand, as well as in a spotty non-neuroanatomic distribution over the dorsum and proximal regions of the fingers of her left hand and over the volar tips of all of the fingers of the left hand, no other associated sensory abnormalities to pin, were noted. Position sense, as well as 2-point discrimination was preserved in both hands, including over the volar tips of all of the fingers, bilaterally.

Her neck was supple and had full range of motion. Other than for a questionable suggestion of diminution of her left radial pulse with

DRS. RABIN, FREMED, PRINCE, P.C.

Latronica, Susan
February 20, 2014
Page 4

testing of the Adson's maneuver when she sharply and fully rotated her head-neck to the right, the Adson's maneuver was negative. Straight leg raising produced no symptoms. Flexion, lateral flexion, and hyperextension of the back were performed normally. No paraspinal muscle spasm was noted. Motion of her shoulders and scapulo-humeral rhythm were normal-symmetrical.

At the initiation of the evaluation, to touch, the tips of the fingers of both hands were cold, perhaps a tad more on the left, but as the evaluation progressed and she was noted to keep both of her upper extremities downward and/or in her lap, to touch, no asymmetries of temperature with respect to her finger/finger-tips or hands was appreciated. During the examination, palpation and pressure, over each of her hands, including the fingers of both hands, elicited no complaints or outward manifestations of discomfort. No trophic changes were observed. No asymmetric color changes of her fingers was appreciated.

She bites her nails, including with respect to all of the nails of both hands.

She had rings at the base of each ring finger.

No trophic changes were observed.

The bottoms of her footwear were worn in a symmetrical fashion.

Mrs. Latronica voiced no dissatisfaction with the examination; her appearance when she left the examination appeared to be unchanged from that noted when she arrived.

**REVIEW OF RECORDS:**

Reference is made to my having previously reviewed medical records with respect to Mrs. Latronica's clinical history, all as noted in my letters of 08/31/11 and of 09/25/11.

**REVIEW OF ADDITIONAL MEDICAL RECORDS:**

A report with respect to an electrodiagnostic evaluation performed by Dr. R.A. Wagner, of New Jersey Neurologic Associates, P.A., Wayne, New Jersey, on 07/27/07, appeared to be identical to an electrodiagnostic report that was reviewed in my letter of 09/25/11 (pages 3-4).

Mrs. Latronica was evaluated by a vascular-surgical specialist, Dr. H.L. Ciocon, of North Jersey Thoracic & Cardiovascular Surgical Offices, P.A., Clifton, New Jersey. A brief handwritten record, dated 11/13/07, identified no objective clinical abnormality; the report

DRS. RABIN, FREMED, PRINCE, P.C.                    Latronica, Susan
                                                    February 20, 2014
                                                    Page 5

appeared to be similar to that which was noted in my letter of
08/31/11 (page 6). An accompanying vascular evaluation performed at
Chilton Memorial Hospital, on 11/21/07, and noting that the study was
normal, including normal pressures throughout the left, arm, forearm,
and wrist, appeared to be similar and/or identical to such a study and
report that was noted in my letter of 08/31/11 (page 6). An
accompanying part of the report referred to Mrs. Latronica's having
complained of sensations of: pins and needles, numbness, starts to
hurt," when the left wrist was squeezed or the Doppler was pushed
down; no other associated symptoms and no other objective clinical
findings were identified.

She was evaluated neurologically by Dr. G. Alweiss, Roseland, New
Jersey, on 09/08/10. Dr. Alweiss noted a past history of post-partum
depression. At the time she was working as a substitute teacher. She
was in no acute distress. She provided her history well. Examination
revealed no trophic changes. Her hands showed equal temperatures and
good distal pulses. She reported a subjective diminution of sensation
to vibration along the fourth and fifth digits of the left hand as
compared to the right. Otherwise, no objective clinical findings of
neurologic abnormality were noted. Dr. Alweiss referred to
observations of a borderline left carpal tunnel syndrome, which was
asymptomatic at the time.

Also forwarded for review were miscellaneous records-documents.

**IMAGES FORWARDED FOR REVIEW:**

Forwarded for review were photographs of Mrs. Latronica's left hand,
as well as a USB thumb drive that included videos of these same
photographs of Mrs. Latronica's left hand. Reference is made to her
having two rings and some constriction at the base of her left ring
finger. The volar tips of her fingers, as well as the thumb, were a
tad dusky but was a bit more prominent over the volar tip of the left
ring finger. No photographs or video of her right hand was provided
for comparison.

**IMPRESSION:**

Other than for some questionable-minimal suggestion of slight
palpatory coolness at the tips of the fingers of the left hand as
compared to the right hand, all of which improved and which was no
longer evident as the evaluation progressed, as noted, examination
today revealed no objective clinical findings of neurologic
abnormality indicative of central, radicular, or peripheral nervous
symptom dysfunction. Reference is made to some of her responses today
as being non-neuroanatomic/non-neurophysiologic, as well as
inconsistent with responses as noted by other examiners.

DRS. RABIN, FREMED, PRINCE, P.C.                    Latronica, Susan
                                                    February 20, 2014
                                                    Page 6

Additionally, manipulation and palpation of the fingers of her left hand, were unaccompanied by outward manifestations or complaints of allodynia or hyperesthesia.  In this context, reference is also made to her having tolerated electrodiagnostic evaluation, as well as the wearing of rings on her fingers, and that she continues to be fully employed as a pre-school teacher of 3-year-olds, during which time she fulfills the tasks demanded of her by her work.  Reference is also made to the non-neuroanatomic restriction of movements that was observed, all of which improved and which was no longer evident when she was distracted.

Since she was last seen Mrs. Latronica has had no medical follow-up and no medical intervention, including that she has been taking no medications for alleged symptoms.

Despite the incident of 06/21/07, Mrs. Latronica previously worked as a substitute teacher and more recently, has been working full-time, as a pre-school teacher of 3-year-old children.  She is independent with respect to activities of daily living.  She drives.  She shops, cooks, cleans, and socializes, the latter primarily by accompanying her sons to their hockey games.

With respect to the incident of 06/21/07, from a review of her interval history, as well as from a review of her prior medical history and evaluations, as well as my examination today, to a reasonable degree of medical probability, I continue to find no indication of Mrs. Latronica's having suffered permanent neurologic injuries or abnormalities, including no findings of her having complex regional pain syndrome, neither type I nor type II.

In contrast, reference is made to the questionable vascular nature of her symptoms, most saliently the unilaterality of what she allegedly experiences, in association with a slightly diminished left radial pulse on Adson's maneuver testing, as well as electrodiagnostic, but asymptomatic findings of left median neuropathy, as noted, for all of which she should follow-up with her family-treating physician(s), for consideration of vascular-rheumatologic assessment, as warranted clinically, and for which she should also be alerted by her attorney when this letter is reviewed, but all of which would be between Mrs. Latronica and her family-treating physician(s), all incidental and unrelated to what occurred on 06/21/07.

If there is a need to review other medical records, reports, documents, or imaging studies, please forward them.

DRS. RABIN, FREMED, PRINCE, P.C.

Latronica, Susan
February 20, 2014
Page 7

I affirm that the information contained within this document was
prepared by and is the work product of the undersigned, and is true to
the best of my knowledge and information.

Thank you for having referred Mrs. Susan Latronica for neurologic
examination.

Yours truly,

Aaron Rabin, M.D., Ph.D., FAAN, FACP

AR/mc